Joseph SHALVOY et al., Plaintiffs-Appellants,

v.

Hugh C. CURRAN et al., Defendants-Appellees.

No. 338, Docket 31872.

United States Court of Appeals Second Circuit.

Argued March 21, 1968.

Decided April 16, 1968.

George W. Ganim, Bridgeport, Conn., for plaintiffs-appellants.

Albert L. Coles, Bridgeport, Conn. (Robert J. Testo, and John J. McGuinness, Bridgeport, Conn., on the brief), for defendants-appellees.

Before LUMBARD, Chief Judge, and FRIENDLY and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Under the provisions of the Charter of the City of Bridgeport, Connecticut, the legislative powers of the municipality are vested in a Common Council, or Board of Aldermen. Formerly that body consisted of the Mayor and sixteen aldermen, one of whom was elected from each of sixteen voting districts in the City. On June 22, 1967, however, the Charter was amended by the Connecticut General Assembly by the enactment of Special

Act 213 [1] which redistricted the City into ten new voting districts each of which was empowered to elect two aldermen, or a total of twenty, which, with the Mayor, constituted the Common Council. Under the Act, the territorial limits of the City's aldermanic districts were made to coincide with the boundaries of the ten Connecticut state assembly districts which had been allotted to the City of Bridgeport as a part of the 1965 reapportionment of the House of Representatives of the Connecticut State Legislature. See C.G.S.A. § 9–10c.

On July 14, 1967, the present action challenging Special Act 213 as a violation of the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution was commenced in the District Court by Joseph Shalvoy, Emma Gowans, and Helen Delmore, the plaintiffs-appellants, residents of the three most populous aldermanic districts in the City of Bridgeport, against the Mayor and certain other City officials, the defendants-appellees. The claim of unconstitutionality was founded solely upon the alleged mathematical dilution brought about by Special Act 213 of votes cast in municipal elections by the plaintiffs and others residing in districts of greater than mean population. The complaint asked that the City-wide reapportionment effected under the Special Act be declared unconstitutional, and that further aldermanic elections be enjoined until Bridgeport was redistricted in accordance with constitutional standards.

The plaintiffs moved for summary judgment and the defendants moved to dismiss the complaint for failure to state a claim. Treating the defendants' motion as one for summary judgment, F.R. Civ.Proc. 12(b) (6), the district court, in an opinion dated September 27, 1967, granted the motion and dismissed the complaint on the merits. From the judgment entered, the plaintiffs have appealed.

The case was submitted to the district court on the basis of population figures contained in the official 1960 census for the City of Bridgeport. According to that information, the populations of the ten new aldermanic districts in the City range from 19,086 for the largest district, to 13,220 for the smallest. Assuming the accuracy of the basic numbers, this means that a person who happened to reside in the largest district in the City would, as a consequence, suffer a dilution in his vote of 44% as compared with that of a resident of the least populous district, and of 22% as compared with that of a person living in the hypothetical district of mean population. Similar calculations for the second and the third largest districts show population variances, and corresponding vote dilutions, of 35% and 23% in relation to the smallest district, and 14% and 4% as compared with the mean.[2]

On this appeal, the appellants, relying principally upon Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501

1. Special Act 213 provides in pertinent part:
"Section 1. * * * The city of Bridgeport shall be divided into as many voting districts as there are assembly districts in said city. The territorial limits of each voting district shall be those within the city of Bridgeport which are described in the general statutes as assembly districts in the city of Bridgeport.
 * * * * *
"Section 3. * * * There shall be a common council of the city which shall consist of a mayor and two aldermen from each voting district to be elected by ballot, and the term of office of such aldermen shall begin on the Monday next succeeding their election. At the city meeting for the election of city officers in the odd-numbered years, two aldermen shall be elected from each voting district by the electors of the city then registered in such voting district. Such aldermen shall be residents and electors in the voting district which they represent and shall hold office for two years. * * * *"

2. The total population of the City of Bridgeport in 1960 was 156,748, which indicates a mean or average population of 15,675 for the ten aldermanic districts established under Special Act 213. After district #133, with 19,086 residents, which is the largest, the next two are #131 with 17,896, and #136 with 16,-354.

(1967), argue that their demonstration of a maximum population variance of 1.44:1 between the largest and the smallest district in the City of Bridgeport prima facie established the unconstitutionality of Special Act 213, and that thereafter the burden was on the proponents of the municipal redistricting provisions to justify the challenged deviations from equality in terms of acceptable state or local policy, which, they claim, has not been done. In Swann v. Adams, supra, the Supreme Court reversed a judgment of the United States District Court in Florida approving a reapportionment plan for both Houses of the Florida State Legislature, in which the ratio between the largest and the smallest senatorial district was 1.30:1, and the ratio between the largest and the smallest representative district was 1.41:1, because the record before it failed to reveal any effort on the part of the State or the District Court to explain these population discrepancies in terms of one or more acceptable policies of the State. Similarly, the appellants argue, the record in this case fails to reveal the existence of specific factors which would justify the population variances among Bridgeport's aldermanic districts in terms of acceptable local policy, or in terms of some State policy which has specific relevance to local voting.

Since the argument of this appeal, the Supreme Court has made clear that the principle of "one man, one vote" [3] applies to redistricting cases involving the legislative arm of a municipality, such as the City of Bridgeport, Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45, Decided April 1, 1968. Nevertheless, the appellants' assertion based upon Swann v. Adams does not necessarily govern under the particular circumstances of this case. In the Swann case the Supreme Court suggested that the State's districting plan, based upon congressional district lines, might have passed constitutional muster despite population variations in the ratio of 1.41:1 had it been made to appear that

in this manner the scheme came "as close as 'practical' to complete population equality." 385 U.S. at 445, 87 S.Ct. at 573. While the State advanced just such a claim in Swann v. Adams, the Court found it unpersuasive in light of the fact that the appellants had submitted to the trial court their own districting scheme, which came much closer to proving districts of equal population than did the State's plan, and, in addition had suggested specific amendments which were ignored by the district court but which, if adopted, would have measurably reduced the population differences in the version which was finally approved. The appellants in the present case, however, have failed to come forward with their own plan at any time in these proceedings, either in the district court, in this court, or when Special Act 213 was pending before the General Assembly. This fact lends support to the appellees' basic position that, because of the relocation of large segments of the population of Bridgeport between 1960 and 1967 resulting from extensive urban redevelopment and the construction of a large connecting highway with the Connecticut Turnpike, it was impossible to make an accurate determination of population distribution and that therefore the redistricting solution adopted by the General Assembly in Special Act 213 was, under the circumstances, the only practicable alternative available to the legislature in June of 1967.

Under these circumstances, we think that there was no course open to the District Court in September of 1967 other than to uphold the challenged redistricting plan, and to permit the holding of the November 7, 1967 aldermanic election which the appellants sought temporarily to enjoin, rather than to take such drastic action, to have immediate impact on the 1967 City election, on the strength of so doubtful a record. While census figures are a proper basis for population determination of a particular place in reapportionment cases over the ten years following its taking, under

3. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

circumstances such as those here presented where such large and obvious changes in population have occurred as to be subject to judicial notice, the census report of seven years before is not immune from challenge. We are aware of no Supreme Court decision which endows census figures with a conclusive presumption of correctness or holds them to be immutable and irrebuttable for the purpose of evaluating a particular districting plan. Where a statewide scheme is under consideration, urban renewal or redevelopment or other takings of residential areas for public purposes in particular cities scattered throughout the state may have too insignificant an effect on the overall plan to justify departure from presumptively reliable census information. But where, as here, the plan is one concerned only with a single city and extensive redevelopment has occurred in a substantial portion of the geographical area under consideration, it is highly likely that the population figures based upon an antecedent federal census are extremely inaccurate and for the most part unreliable. In the present case, it is undisputed that the State Street portion of the Bridgeport Redevelopment has resulted in a substantial exodus of people from district #131, the second most populous according to the 1960 census figures. While counsel for the appellants represented at the oral argument that districts #133 and #136 have had no similar experience, there is no evidence in this record on summary judgment to show that this is so, or to show that the admitted population displacement in Bridgeport did not land in large numbers in what was assumed, on the basis of the 1960 census, to be the smallest district, #138, thereby eliminating, or substantially reducing, the challenged population variances. Of course, the changes may have made the discrepancies even greater.

Although the appellees have urged that no further redistricting can practicably be effected in the City of Bridgeport prior to the completion of the next federal census in 1970, it is apparent that a relatively accurate determination of the population of each of the several aldermanic districts can be made at the local level in time for the next biennial aldermanic election in November of 1969. The General Statutes require a canvass of electors, the machinery for which can readily be adapted to include a City-wide census of the populace, which must be made well in advance of the 1969 aldermanic election, and in time for the formulation of a new plan to be submitted for court approval.

██ The election laws of Connecticut provide, General Statutes Rev.1958, as amended, § 9–32,[4] that, within six months before each "regular election," which means any state or municipal election, § 9–1(n), the registrars of voters of every municipality "shall cause a complete canvass to be made of each street, avenue or road within such municipality, for the purpose of ascertaining the name of any elector formerly residing on such street, avenue or road who has removed therefrom * * *." It appears to be the practice in the City of Bridgeport to make such a canvass on a yearly basis, and, in May of 1968, this action will again be taken in preparation for the State elections to be held in the fall of this year. While the statute requires a canvass of *electors*, which differs from a census of the local *population*, there is no reason why the City of Bridgeport cannot require its solicitors, who must carry out this task door-to-door throughout the community, to inquire additional-

4. § 9–32, as amended by Public Act 55 (May 5, 1967) provides:
    "In each municipality the registrars, within the period of six months before each regular election to be held in such municipality, shall cause a complete canvass to be made of each street, avenue or road within such municipality, for the purpose of ascertaining the name of any elector formerly residing on such street, avenue or road who has removed therefrom; provided not more than one such canvass need be made in any municipality in any period of twelve consecutive months."

ly as to the number of persons who live in each dwelling.[5]

We were also informed at the oral argument by counsel for the appellants that the Charter of the City of Bridgeport is currently in the process of being revised by a Charter Revision Commission, a bi-partisan body [6] of which counsel is a member, acting pursuant to the Connecticut Home Rule Act, C.G.S.A. § 7–187 et seq. (1958), as amended (Supp. 1966). The District Court, while retaining jurisdiction itself, should order the City, acting by its Revision Commission, to consider and pass upon the matter of the equalization of the population of the several aldermanic districts in the light of the municipal canvass of the population and to make such amendments as may be necessary to the aldermanic district provisions of Special Act 213 in the event that the census re-evaluation should reveal the existence of significant population variances.[7] This should be accomplished by such date in the fall of 1968, as the District Court may fix, in order that the court may reconsider the case, if necessary, on a record containing relatively accurate evidence of the actual population of the various aldermanic districts well in advance of the City election of 1969.

■ There can be no question that the Charter Revision Commission has ample statutory authority to enable it to pursue the course we have indicated. Although the current apportionment in Bridgeport was effected by a Special Act, passed by both Houses of the State Legislature, the very purpose of the new Home Rule Act is to relieve the General Assembly of the burdensome task of handling legislation of local municipal concern. See C.G.S.A. § 7–188; Stone v. Reidy, 152 Conn. 419, 209 A.2d 674 (1965); Littlefield, Municipal Home Rule—Connecticut's Mature Approach, 37 Conn.Bar J. 390, 402 (1963). Problems which arise in connection with local apportionment schemes are, at least in the first instance, better left to such political entities, and a federal court of equity is entitled to "stay its hand temporarily while recourse to such a remedial device is attempted." Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 737, 84 S.Ct. 1459, 1474, 12 L.Ed.2d 632 (1964). See also Reynolds v. Sims, 377 U.S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Note, Reapportionment, 79 Harv.L.Rev. 1226, 1281–1283 (1966).

■ It appears that the factual issue as to the correct population of each of the ten aldermanic districts was not presented to the trial court and it did not consider it. It was conceded by both parties on appeal that this underlying question exists. Until it is resolved no final decision in the case should be made. The present action was brought in July of 1967 with a view to preventing the City election of November 1967 from taking place until there had been a reapportionment of the aldermanic districts. The District Court entered its judgment dismissing the complaint on September 27, 1967 and the City election

---

5. The District Court may in its discretion prescribe such conditions as it may deem necessary to insure the authenticity and reliability of such a canvass of the populace.

6. Under the provisions of C.G.S.A. § 7–190, such a Commission must be comprised of between five and fifteen electors, "not more than a bare majority of whom shall be members of any one political party."

7. In the event that the Charter Revision Commission as a result of the canvass decides that it should draft a Charter amendment redistricting the City, procedures for the approval of such action are set out in C.G.S.A. § 7–191, providing for public hearings, submission of the Commission's report to the Common Council, and final approval by majority vote of the electorate, whereupon the plan would, under the statute, become effective. Any constitutional objections might then be raised by the plaintiffs-appellants in the district court, however, since majority acceptance of a plan which violated the Equal Protection Clause would not cure the defect or justify its imposition on a protesting minority. Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 736–737, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).

was held. The effect of the trial court's judgment was to make valid the election of the present board of aldermen, insofar as the issue of reapportionment was concerned, subject to the decision of this court on appeal. We conclude that it would be unnecessarily disruptive to the government of the City of Bridgeport to do otherwise than affirm the decision below as a partial summary judgment, confined strictly to the question of the validity of the election of the present board. The broader issue as to reapportionment and future City elections, however, which requires the taking of evidence and findings as to the population of each of the several districts, we remand to the District Court with direction that it issue appropriate orders implementing this decision and that it retain jurisdiction for the later consideration and determination of the basic issue in the case.

Affirmed in part and remanded for further proceedings.