343 So.2d 17 (1977)
In re ADVISORY OPINION OF the GOVERNOR REQUEST OF NOVEMBER 19, 1976 (CONSTITUTION REVISION COMMISSION).
No. 50611.
Supreme Court of Florida.
February 15, 1977.
*18 John E. Mathews, Jr., and Jack W. Shaw, Jr., of Mathews, Osborne, Ehrlich, McNatt, Gobelman & Cobb, Jacksonville, and Donald M. Middlebrooks, Orlando, Gen. Counsel for the Governor, for Reubin O'D. Askew, Lew Brantley and Donald Tucker.
Thomas H. Barkdull, Jr., Miami, amicus curiae.
Richard T. Earle, Jr., of Earle, Earle & Forizs, St. Petersburg, amicus curiae.
Jon L. Mills and R. Lee Andersen, Gainesville, for Center for Governmental Responsibility, amicus curiae.
Edward J. Atkins, Miami, President, Louis de la Parte, Jr., Tampa, Chairman, Fla. Constitution Committee, and William B. Wiley, Asst. Staff Counsel, Tallahassee, for The Florida Bar, amicus curiae.
Robert L. Shevin, Atty. Gen., and James D. Whisenand, Asst. Atty. Gen., for amicus curiae.
Chesterfield Smith and Martha W. Barnett of Holland & Knight, Lakeland, for The League of Women Voters of Fla., amicus curiae.
The Honorable Reubin O'D. Askew
Governor, State of Florida
The Capitol
Tallahassee, Florida
Dear Governor Askew:
We have the honor to acknowledge your communication of November 19, 1976 requesting our advice, pursuant to Article IV, Section 1(c) of the Florida Constitution and Rule 2.1(h) of the Florida Appellate Rules, in regard to your executive powers and duties relative to the Constitution Revision Commission authorized by Article XI, Section 2 of the Constitution. Omitting its formal parts your letter reads:
"The Florida Constitution, 1968 Revision, was adopted at the general election held on November 5, 1968, and became effective on January 1, 1969. Article XI, Section 2, quoted in full below, established by constitutional mandate a Constitution Revision Commission:
(a) Within thirty days after the adjournment of the regular session of the legislature convened in the tenth year following that in which this Constitution is adopted, and each twentieth year thereafter, there shall be established a constitution revision commission composed of the following thirty-seven members:
(1) the attorney general of the state;
(2) fifteen members selected by the governor;
(3) nine members selected by the speaker of the house of representatives and nine members selected by the president of the senate; and
(4) three members selected by the chief justice of the supreme court of Florida with the advice of the justices.
(b) The governor shall designate one member of the commission as its chairman. *19 Vacancies in the membership of the commission shall be filled in the same manner as the original appointments.
(c) Each constitution revision commission shall convene at the call of its chairman, adopt its rules of procedure, examine the constitution of the state, hold public hearings, and, not later than one hundred eighty days prior to the next general election, file with the secretary of state its proposal, if any, of a revision of this constitution or any part of it.
Pursuant to this section, the Governor has the express duty to select fifteen members of the Constitution Revision Commission and to designate its chairman, who in turn will convene the Constitution Revision Commission.
Due to an apparent conflict between Section 2 of Article XI and Section 3(b) and (d) of Article III, Section 5 of Article VI and Section 5 of Article XI, I am uncertain as to when the Constitution Revision Commission should convene and undertake its assignment, and therefore, when I should select fifteen members and designate the chairman. Intimately connected therewith is the question of when the final report of the Constitution Revision Commission is to be filed with the Secretary of State and whether it is to be submitted to the electors at the general election in November of 1978 or 1980.
The apparent conflict can be illustrated by a review of the respective sections of the Constitution referred to above. Article III, Sections 3(b) and (d), require the Legislature to convene its regular session on:
... the first Tuesday after the first Monday in April of each odd-numbered year, and on the first Tuesday after the first Monday in April, or such other date as may be fixed by law, of each even-numbered year ...
to continue for not more than sixty consecutive days. At present there is no law fixing another date for the regular session of the Legislature in even-numbered years. Likewise, Article VII, Section 5, mandates that:
(a) general election shall be held in each county on the first Tuesday after the first Monday in November of each even-numbered year ...
Finally, Article XI, Section 5, requires
(a) proposed amendment to or revision of this constitution, or any part of it, shall be submitted to the electors at the next general election held more than ninety days after the ... report of revision commission is filed with the secretary of state ...
If the quoted sections are interpreted to require the Constitution Revision Commission first to convene after the adjournment of the 1978 regular session of the Legislature ("the tenth year following that in which this constitution is adopted"), then its proposed revisions, if any, apparently should be submitted to the electors at the general election in November of that same year. Such a time frame appears to be a practical impossibility. If the Legislature convenes, as now required, on April 4, 1978, then the regular session will probably adjourn about June 3, 1978. Thus, if the Constitution Revision Commission is not convened until the 1978 Legislature adjourns, then the earliest date it could convene would be after June 3, 1978, but before July 3, 1978. But Article XI, Section 2(c) requires the Constitution Revision Commission to file its proposals with the Secretary of State at least 180 days prior to the general election in November of 1978, or on or before May 11, 1978.
It is of course theoretically possible to accomplish the constitutional revision envisioned by Article XI, Section 2, completely within the calendar year of 1978. However, to do so would require affirmative legislation providing for an early, regular legislative session in 1978 pursuant to Article III, Section 3(b). Additionally, advance preparation would obviously have to be undertaken by a legislatively established revision commission, or committee, or some other entity designated by law for that purpose. No such steps have been taken by the Legislature; indeed, no legislative implementation of the constitutional provisions relating *20 to the Constitution Revision Commission are mandated by the Constitution.
It has also been suggested to me by constitutional scholars that Article XI, Section 2, can possibly be construed to require the Constitution Revision Commission first to be convened at any time during 1978 so long as it is convened no later than thirty days after adjournment of the regular session of the 1978 Legislature. Under such circumstances, its proposals, if any, would then be presented to the electors for acceptance or rejection either at the general election in November of 1978, which would require the simultaneous meetings of the regular session of the 1978 Legislature and the Constitution Revision Commission, and thus as a practical matter prevent legislators from serving as members of the Constitution Revision Commission contrary to the obvious constitutional intent that at least some present members of the Legislature do so; or at the general election in November of 1980, which to me seems contrary to the manifest constitutional intent that the people have an opportunity to review the Constitution at the general election held exactly ten years after its adoption at the general election held in November of 1968.
What otherwise appears, when viewed in isolation, to be the plain language of Article XI, Section 2, thus presents a serious and perhaps irreconcilable conflict with other sections of the Constitution when the document is considered as a whole. Faced with such ambiguities or conflicts, and in order to properly discharge my constitutional duties, I ask this Court to interpret such language so that it harmonizes so far as possible the related sections and effectuates the intent of the framers and the people adopting the Constitution.
Each of the two alternative constructions above outlined when considered in light of the task to be accomplished seem to me to be wrong, impractical and improper. If time constraints are imposed on the mandated constitution revision, such restraints will be both counterproductive to the sound deliberation essential to proper constitutional revision and contrary to the manifest intent of the people as expressed in the Constitution. The Constitution itself specifically indicates that the Constitution Revision Commission must be given broad time parameters for its work so as to foster a thorough and cautious review; the Constitution Revision Commission must have the opportunity to seek the advice and counsel of laymen, academicians, legislators, public officials, lawyers, judges and interested citizens, to hold the required public hearings, and to timely file its report with the Secretary of State.
A feasible alternative interpretation suggested to me by other constitutional scholars is that the members of the Constitution Revision Commission be appointed promptly after the adjournment of the 1977 Legislature and that the Constitution Revision Commission be convened at the call of its chairman within thirty days following the adjournment of the 1977 regular session. It would then have the balance of that year and the early part of 1978 in which carefully to consider constitutional revision and to timely present its proposal, if any, for a revision. Under such an interpretation, the electors would have at least 180 days before the general election in November of 1978 to decide whether to accept or reject such proposals.
Due to doubts above expressed about the proper constitutional interpretation of my duties, I request that you resolve the following specific questions relating to my responsibilities as Governor:
1. Do I have the authority to initiate the convening of the Constitution Revision Commission by appointing, not later than thirty days after the adjournment of the regular session of the 1977 Legislature, the fifteen members I am required to select and to appoint its chairman and direct that the chairman file with the Secretary of State the proposals, if any, of the Constitution Revision Commission for a revision of the Constitution or any part thereof, not later than 180 days prior to the general election to be held in November of 1978?

*21 2. If the answer to the foregoing question is negative, when should I initiate the convening of the Constitution Revision Commission by appointing the fifteen members I am required to select and by designating its chairman; and further, when should I direct the chairman of the Constitution Revision Commission to file the proposals, if any, of the Constitution Revision Commission for a revision of the Constitution or any part thereof with the Secretary of State?
Constitutional revision is a matter of great moment and import to this state and its people. Therefore, I respectfully suggest that this Court under its rules of procedure permit all interested parties to be heard on the questions presented herein through both written briefs and oral arguments, and further that this Court favorably consider applications to do so by those persons, who because of their previous experience in constitutional revision and interpretation might be of assistance to this Court as amicus curiae."
Upon receipt of your letter, we made a preliminary determination that your request was answerable and that we would exercise our discretion to do so. We then authorized interested persons to file briefs and participate in oral arguments. The following persons and groups appeared and presented their views:
(1) the Governor, jointly with the president of the Florida Senate and the speaker of the Florida House of Representatives;
(2) the Attorney General;
(3) the League of Women Voters of Florida;
(4) Judge Thomas H. Barkdull, Jr. and Richard T. Earl, Jr., members of the 1965 Constitution Revision Commission;
(5) the Center for Governmental Responsibility of the University of Florida College of Law; and
(6) the Florida Bar.
Counsel for some of the parties also served on the 1965 Commission.
All parties urged us to answer your first question in the affirmative, and in our opinion this is the proper response to your inquiry. We have gone further, however, since the need for guidance beyond the questions posed was brought to light during oral argument.[1]
We do not deem it essential to review in detail the history of the 1965 Constitution Revision Commission, or the events which transpired between its formation in January 1966 and the adoption of our present Constitution on November 5, 1968. All parties agree on four points basic to your inquiry:
1. The language of the Constitution in its present form is defective if read literally, in that all of its terms cannot be carried out in accordance with the time directives set out in the various sections of Article XI. Your letter makes clear the problems in that regard.
2. The technical errors in language were caused by the retention of language originally put into the proposed Constitution when it was scheduled for adoption in 1967, which the framers did not change when the original timetable was disrupted by Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), and adoption deferred to 1968.
3. This Court is the only place in which the inherent ambiguities of the Constitution can be resolved.
4. No matter what rationale we adopt or what interpretation we supply to the words in the Constitution, the fact of the matter is that we are being asked to rewrite *22 one or more of its provisions in order to make the document work. (We are asked, of course, to make it work in the way most consistent with the intent of the people of Florida at the time of its adoption, as that intent is now manifest through hindsight, recollection, and various documents.)
Our review of the constitutional materials supplied in this case, as well as our independent research, persuades us that the parties are correct in their assertion that the drafters of the 1968 Constitution simply failed to adjust the timetable set forth in Article XI, Section 2 of their proposal when the Legislature was inadvertently prevented from submitting the document for adoption in 1967. Additionally, we are persuaded by the parties and our own analysis that there is absolutely no way to reconcile without judicial gloss the disharmonious provisions which appear in that section. Under these circumstances, we must abandon as fruitless any notion that we can "interpret" or "construe" particular language within the Constitution to achieve a result which is not only workable but reasonably consistent with the intent of the people. We must, therefore, look outside the document to verify the intent behind mandatory periodic Constitution review, and then suggest those adjustments or accommodations which we believe are necessary to the performance of your duties as chief executive.
The touchstone for determining the intent of a constitutional provision has always been the intent of the people at the time the document was adopted.[2] The documents which were submitted to the voters of Florida in mid-1968 as explanatory material for the proposed Constitution uniformly indicate (to the extent they bear on the issue before us) an intention to create constitution revision commissions (i) which would act without intervention of the Legislature (ii) in the tenth year after the Constitution was adopted and (iii) in each twentieth year thereafter. It is persuasive to our conclusion that we can satisfy those intentions by answering your first question in the affirmative. It is also persuasive that such an affirmative answer will carry out the apparent goals of the framers of the Constitution (i) that the process of constitution revision should take place with commissioners selected in an odd numbered year (when there are no public elections to compete for the time of commissioners), and (ii) that the commissioners should have adequate time to perform the responsibilities assigned to them.
Militating against the creation of a commission in 1977 is the notion that the people of Florida obviously intended to have an initial ten years of experience under the 1968 Constitution before revisions were brought to them for consideration. If the commissioners first meet in 1977, they will not have the full benefit of that experience for their deliberations. Nonetheless, the voters of the state will have had exactly ten years' experience at the time they are asked to pass on any proposals emanating from a 1977 commission, since the election would be held in November 1978. Thus, any governmental experiences not available to the commission before its report is filed (not later than 180 days before the November general election) will be known to the voters before they accept or reject the commission's proposals. It seems, then, that an affirmative answer to your first question is not necessarily inconsistent with the notion that the Constitution should "settle" for ten full years before revisions are considered at the polls.
Finally, we are persuaded toward an affirmative answer to your first question by two other general considerations. First, since there is an acknowledged ambiguity it seems preferable to allow the people of the state to vote on proposals for change (which might include a correction of these problems for future revision commissions) at the earliest possible opportunity. That is, assuming there is doubt as to whether the *23 commission process or the people's vote was intended to occur in 1978, it is, in our view, better policy to obtain a resolution of the ambiguity by an early vote of the people rather than one deferred until 1980. Second, we cannot ignore the fact that appointing authorities for 34 out of the 37 prescribed positions on the commission are represented in this proceeding and of the view that your first question should be answered in the affirmative. All of these appointing authorities will be in office whether the commission is convened in 1977 or 1978, so there is no unrepresented group of potential officeholders whose appointment rights could be affected by our response to your inquiry.
We recognize that an argument can be made in support of a 1978 commission and 1980 vote on its proposals, based on a construction of Article XI which emphasizes the formation of the commission "in the tenth year" as prescribed in Section 2(a). Those of our colleagues who prefer that emphasis recognize they must construe Section 2(c) to postpone the electors' vote on constitution revision from the "next general election" after the commission convenes to the general election next following the conclusion by the commission of its constitutional responsibility to meet and hold public hearings. They would do so, however, in order to gain the "advantages" of longer deliberations, interim elections, votes on legislatively proposed constitutional amendments, and a change in governmental leadership. We sharply disagree with the view that these events are "advantages" to the revision process, let alone consistent with the rationale of having this process at all.
For one thing, by placing an emphasis on the time for convening the commission over the time for ending its deliberations, the effect is to free the commission from any time limitation on its very existence. The members could, under that construction of Section 2(c), hold public hearings indefinitely if a majority of members decide, for whatever reasons, to co-opt the public spotlight. This is obviously at odds with the Constitution's express directive for a vote on the commission's proposals, if any, at the "next" general election.
For another thing, it seems to be at odds with the intent of the people to infuse into a constitution revision process which was patently designed to bypass input from the legislative branch, the election of new legislators or an accommodation to the positions candidates for those offices may voice in their election bids. Elective political activity is antithetical to this constitutional review process, unlike the other two reserved in Article XI.
Finally, we view as disadvantageous, rather than advantageous, the addition of influences brought to the process by a second attorney general, governor, and set of legislative leaders. Sound constitution revision must stem from experiences which suggest the need for change. We fail to see any advantage in making the last and most important phase subject to the influence of persons with no experience in office, over those who have had extensive practical experience as Florida's chief legal officer, chief executive, and legislative heads under the existing Constitution.
Without regard to our view of the merits or demerits of these perceived advantages, however, we are satisfied that none of them can be traced to the evolution of the commission revision scheme which appears in Article XI of our present Constitution. We view our role as limited to providing advice to the governor consistent with the purposes for which the people adopted Article XI, without the expression of our philosophical approach to the revision process.
For the foregoing reasons, we respectfully advise you that in our opinion, the 1968 Constitution requires the following acts:
1. You should initiate the convening of a constitution revision commission by appointing 15 members and a chairman during the 30 day period following adjournment of the regular session of the 1977 Legislature ("within" that 30 day period, as the Constitution directs);
2. You should direct the chairman to file the commission's proposals, if any, *24 for Constitution revision with the Secretary of State not later than May 11, 1978, which date is 180 days prior to the general election next succeeding the commission's convening in 1977;
3. The proposed amendments or revisions to the Constitution, or any parts of it, if any, shall be submitted to the electors of the state on November 7, 1978, in accordance with Article XI, Section 5(a) of the Constitution; and
4. Absent any intervening alteration of the provisions of Article XI, Section 2, the constitutional timetable for future commission revisions shall be that
(a) a constitution revision commission having the same composition as set forth in Section 2(a) should be convened during ("within") the 30 day period following adjournment of the regular session of the 1997 Legislature,
(b) the proposal for revision of the Constitution, if any, presented by that commission shall be filed with the Secretary of State at least 180 days prior to the general election scheduled in November 1998 and shall be voted on by the people of Florida at that general election, and
(c) the cycle for the commission revision process shall continue at 20 year intervals from the time frames set out in the preceding paragraphs.
 Respectfully,
 BEN F. OVERTON Chief Justice
 JOSEPH A. BOYD, Jr.
 ARTHUR J. ENGLAND, Jr.
 ALAN C. SUNDBERG
 JOSEPH W. HATCHETT
 Justices
KARL and ADKINS, Justices, dissenting.
We must disagree with the majority of the Court because we are inexorably drawn to the conclusion that the members of the Constitution Revision Commission should be appointed within thirty days after the adjournment of the regular session of the Florida Legislature in the year 1978 and that their product should be considered by the people in the general election to be held in November, 1980, unless placed on the ballot earlier by the Legislature. We would, therefore, answer the Governor's first question in the negative.
We are obliged to construe the Constitution in such a way that all provisions may stand and have effect. In Burnsed v. Seaboard Coastline Railroad Company, 290 So.2d 13 (Fla. 1974), this court said:
"Where a constitutional provision will bear two constructions, one of which is consistent and the other which is inconsistent with another section of the constitution, the former must be adopted so that both provisions may stand and have effect. State v. Butler, supra; Advisory Opinion to Governor, 96 So.2d 541 (Fla. 1957). Construction of the constitution is favored which gives effect to every clause and every part thereof. Unless a different interest is clearly manifested, constitutional provisions are to be interpreted in reference to their relation to each other, that is in pari materia, since every provision was inserted with a definite purpose. [cases cited]."
Moreover, we should be ever so reluctant to extract only the essence of a constitutional provision and proceed to fabricate a new section based upon our own retrospective view of what the people intended. Justice Terrell, in Ervin v. Collins, 85 So.2d 852 (Fla. 1956), appropriately stated:
"We are called on to construe the terms of the Constitution, an instrument from the people, and we are to effectuate their purpose from the words employed in the document. We are not permitted to color it by the addition of words or the engrafting of our views as to how it should have been written. .. . As pointed out by the chancellor, it must be presumed that those who drafted the Constitution had a clear conception of the principles they intended to express, that they knew the English language and that they knew how to use it, that they gave careful consideration to the practical application of the Constitution and arranged its *25 provisions in the order that would most accurately express their intention."
We should construe with judicial restraint the words and phrases which the people wrote into their constitution. To do otherwise is to disregard the Constitution and to ignore the caveat of Mr. Justice Mathews, writing for the Court in Thomas v. State, 58 So.2d 173 (Fla. 1952):
"Disregard for the Constitution in order to accomplish some reform, or worthwhile purpose, can only lead to the ultimate destruction of Constitutional government."
From the representations made to the Court, we may properly conclude that the technical errors in language were caused by the retention of language which was originally put into the proposed constitution when it was scheduled for adoption in 1967 and which the framers did not change when the original timetable was disrupted and adoption deferred to 1968. This, alone, does not make it appropriate for us to construct a different timetable. It cannot be assumed that, in every instance in which it is represented to the Court that the framers intended but somehow failed to revisit and update a provision in the Constitution, we may ignore the entire provision, decide what the people really meant and then write our views into the Constitution.
For whatever reason, and notwithstanding any alleged errors of the framers, the people of Florida adopted Sections 2 and 5 of Article XI of the Constitution of 1968 in the words and phrases that now come to us for consideration. They should be preserved and construed to avoid conflict. Advisory Opinion to Governor, 96 So.2d 541 (Fla. 1957); State ex rel. West v. Butler,, 70 Fla. 102, 69 So. 771 (1915). Section 2, Article XI, provides:
"(a) Within thirty days after the adjournment of the regular session of the legislature convened in the tenth year following that in which this constitution is adopted, and each twentieth year thereafter, there shall be established a constitution revision commission composed of the following thirty-seven members:
(1) the attorney general of the state;
(2) fifteen members selected by the governor;
(3) nine members selected by the speaker of the house of representatives and nine members selected by the president of the senate; and
(4) three members selected by the chief justice of the supreme court of Florida with the advice of the justices.
(b) The governor shall designate one member of the commission as its chairman. Vacancies in the membership of the commission shall be filled in the same manner as the original appointments.
(c) Each constitution revision commission shall convene at the call of its chairman, adopt its rules of procedure, examine the constitution of the state, hold public hearings, and not later than one hundred eighty days prior to the next general election, file with the secretary of state its proposal, if any, of a revision of this constitution or any part of it."
No conflict exists between Section 2(a) and (b), and any other provisions of the Constitution, nor is there any ambiguity. It is provided that there shall be a revision commission and that it shall be appointed within thirty days after the adjournment of the regular session of the Legislature in the tenth year following that in which the Constitution was adopted. The composition of the commission is prescribed, and provisions are included for designating a chairman and filling vacancies.
Patently, the people intended that the new constitution would be in effect for the better part of ten years before a new commission was appointed to review it.[1] The emphasis is on the date of the appointment of the commission, not on the date of their proposal, if any, or the vote on any such proposal. If the people intended that the *26 commission be appointed in nine years or in the year 1977 or at any other time, they would not have said "in the tenth year."
We are given to understand from the records of the activities of the 1965 commission that the early drafts provided for a first general review of the new constitution in the twentieth year following its adjournment but that the input from the citizens convinced the commission members that the initial review should be sooner, and that the tenth year was ultimately determined to be the most desirable year to begin the important undertaking.
It is understandable that the constitutional scholars wanted a twenty year trial period since the Constitution should be relatively stable and unchanging over the years.[2] The people should have the opportunity to live under its terms, and and there should be enough time for judicial interpretations to refine the document. Any needed intermediate amendments can always be accomplished by proposals from the Legislature or by the process of the initiative provisions. Convening a constitution revision commission each twenty years comports with good constitutional practice and with logic and reason. Making an initial review after ten years' experience with a new constitution will serve a useful purpose. However, to shorten further the time is to relegate the Constitution to the status of a statute and to take from it the stability to which it is entitled.
If the language used in the Constitution is plain and unambiguous, it is not subject to interpretations or construction by the courts. In re Advisory Opinion to Governor, 223 So.2d 35 (Fla. 1969); Advisory Opinion to Governor, 156 Fla. 48, 22 So.2d 398 (1945); City of Jacksonville v. Glidden Co., 124 Fla. 690, 169 So. 216 (1936); Carlton, et al. v. Mathews, 103 Fla. 301, 137 So. 815 (1931); State ex rel. West v. Butler, supra. Here we not only have plain and unambiguous language that mandates the appointments in 1978, but the effects are reasonable and logical. This part of the Constitution should be preserved as it was written and adopted by the people, and it should be given its clearly expressed meaning.
A degree of confusion surfaces when Section 2(c), providing for the filing of the proposals of the commission, is considered. There was near unanimity among the persons and groups presenting briefs and arguments with respect to when the report must be filed that the words "not later than one hundred eighty days prior to the next general election" relate to the next general election following the appointment of the commissioners. This interpretation renders the entire time scheme unworkable.
It is self-evident that, if the appointments are made in June, 1978, as is clearly required by Section 2(a), unless the Legislature moves the date of the session, the commission will begin its labors in default. At that time, there would remain less than one hundred eighty days before the general election of 1978. The suggestion that the Legislature could change the date of the regular session so that the appointments could be made in March of 1978 is also unworkable because only about two months would intervene between the appointments and the report date.
There is no disagreement about the inability of the commission to prepare and present well-reasoned proposals in May of 1978 if the appointments are made during the year 1978. But Section 2(c), Article XI, does not mandate either a report or a vote of the people in 1978.
Section 2(c) contains no date for the first meeting of the commission; it convenes at the call of the chairman. The commission is required to adopt rules of procedure and make an examination of the Constitution but is in no way limited as to the amount of time it may devote to that process. Public hearings are required with no mention of number, locations or time frame. If a proposal for the revision of the Constitution is *27 forthcoming, it must be filed with the Secretary of State not later than one hundred eighty days prior to the next general election. No date is specified, nor is it clear just what general election would be the next one.
If there is to be a proposal for revision from the commission, it should be a product of the people and should be offered only after sound deliberation. In the request for an advisory opinion, the Governor said:
"... commission must be given broad time parameters for its work so as to foster a thorough and cautious review; the revision commission must have the opportunity to seek the advice and counsel of laymen, academicians, legislators, public officials, lawyers, judges and interested citizens."
There must be ample time to fulfill all of those responsibilities, and the people can be presumed to have understood this need when they adopted the language used.
Since no time limits are imposed and such important and time consuming duties are mandated, it must be concluded that the people wanted to consider the revision product at a general election following completion of those responsibilities. If that premise is correct, there is no way the appointments can be made in the year 1978 and the proposals of the commission voted on in the same year.
There is no support in the Constitution for the contention that the people who voted to adopt the Constitution of 1968 intended to vote on revision proposals in 1978, ten years hence. The people did not require that in specific terms, and such a requirement is not implicit. Conversely, the people contemplated the possibility of no vote at all. Section 2 requires no more than that the commission be appointed, study the Constitution and conduct public hearings. If proposals for revision are developed, they are filed with the Secretary of State, and the people will consider them. However, if the commission brings forth no proposals, there will be no vote.
Section 2 of Article XI may be construed to mean that the people intended the appointments to be made in the tenth year and that the proposal, if any, be filed not later than one hundred eighty days before the general election next ensuing after the completion of the mandatory functions.
This interpretation is preferable because it follows the established rules for construction of the Constitution, it does not abandon as fruitless the notion that we can interpret or construe the constitutional language, it requires instead only minimal judicial construction, it preserves all parts of the Constitution, and it comports with the basic premise that the people intended to review their constitution after ten years' experience with it.
The majority raises the spector of the revision commission deliberately holding public hearings indefinitely to co-opt the public spotlight. That, of course, is a possibility just as it is possible that a majority of commission members will conspire to defeat the revision effort by failing to file any proposals. But we should not assume bad faith or improper motivation on the part of the members. We should make the assumption that those who are appointed and agree to serve will do so with the desire to develop needed and meaningful proposals for revision. The majority of the commission will have the power to delay or defeat constitution revision regardless of the time schedule approved. That contingency was made possible by the people in 1968, when they adopted language that requires neither a report of commission action nor proposals for revision.
Under the majority time schedule, the revision commission must file proposals by May 11, 1978, or there will be no revision for another twenty years. As between such an absolute cut-off date and an interpretation that could be used to secure more time for commission labors, the latter is the better approach.
There are many advantages that would follow this interpretation, and they would be important to the revision effort.
Each person having authority to appoint commission members as of June, 1977 (the date proposed by the parties and amici), will *28 also have the appointing authority in 1978, barring death, removal or resignation, with the possible exception of the Chief Justice, who, in any event, must have consent of the justices for his appointments. But the advantages to be gained by the 1978 appointments vis-a-vis the 1977 appointments are that the office of the governor changes hands in January, 1979, the legislative leadership changes in November, 1978, and, unless the incumbent attorney general is reelected, there will be a different person occupying that position in January, 1979. Consequently, any vacancies occurring after those changes take place will be filled by the successors of the present incumbents, and in the case of the attorney general, if a new person takes the office, there will be an automatic change in membership.[3] This is a decided advantage because it broadens the sources of input and diminishes the possibility of excessive influence of any appointing authority.
Since the constitution revision project is an undertaking of the people as opposed to a legislative project,[4] the greatest amount of citizen input should be sought. The proposal for appointment of commission members in 1978 and the vote on their proposals in 1980 provides excellent opportunities for public expression and input. The election campaigns in the fall of 1978 will give candidates a forum for discussing revision proposals and will give the people the opportunity to react. Any legislatively proposed amendments to the Constitution or any proposed amendments resulting from the initiative process up to that time will be passed upon by the people in 1978, giving the commission further guidance. If there is a product ready in May of 1980, there will be one hundred eighty days of debate and discussion laced with legislative campaign activity.
Finally, the legislator-commission member problem is minimized. If the appointments are made in 1977, the legislative members will be able to serve until the beginning of the 1978 regular session which begins April 4, 1978. They may constitute eighteen (almost one half of the membership) or more, and they may be foreclosed from participation in at least the last thirty-seven days of the commission activity. Given the short time for their labors, this could prove to be the most critical period in the entire effort. While the legislative members would also be deprived of the final month of participation under the 1980 proposal, the longer period between appointment and report date would make it more likely that the proposals will be finalized prior to the cutoff date for legislator participation. In that broader time frame, the commission could schedule its own date for completion of the proposals, and there would be ample time to work toward that deadline.
The time schedule prescribed by the advocates of 1977 commission appointments allows a maximum working time of approximately ten months. For all practical purposes, however, the legislative members will have no more than nine months of participation. That may fall far short of being adequate time considering that the revision effort is a citizen project and that most of the members will have personal and business time commitments; that the major holiday seasons fall within that brief time period; that the 1965 revision commission worked from its formation in January of 1966 until the legislative session of 1968; and that, notwithstanding the length of time involved in the previous commission's work, there have already been eighteen amendments adopted and there exists this uncertainty as to when commission appointments should be made. As between an early consideration by the revision commission and a later consideration with more adequate time, the better plan is the one that provides ample time for consideration.
*29 Moreover, if the commission completes its labors and brings forth proposals at an early date, the Legislature always has the option of placing the revision on the ballot in a special election at a time it may select.[5]
The request for this advisory opinion causes the Court to do much more than determine the date for the appointment of members of the constitution revision commission. It calls up for consideration the philosophical approach the Court should take with respect to interpretation of the Constitution. We are here invited to abandon the construction or interpretation efforts and hand down an advisory opinion stating when the commission members shall be appointed, when they shall file their proposals and when the people shall be required to vote on them. We are urged to follow that course by some of the ablest constitutional scholars in the state, representing the leaders of the other two branches of government and organizations known for their good work in this field and their dedication to the public interest.
But the precedent of this court and the teachings of history say to us that we should not be so bold as to undertake a judicial revision of the Constitution. We are taught to preserve all that the people write into their basic document and to proceed cautiously and with restraint in construing or interpreting any part of the Constitution.
The majority opinion says to the people that, if a conflict arises between different parts of the Constitution, we will nullify the part we select and rewrite the provisions to our own preference, even though there may be a less drastic way open to us.
We cannot subscribe to such a position and, therefore, dissent. We would save all of Section 2, Article XI, as the people wrote it and construe Section 2(c) as indicated to reconcile the single conflict and provide for the vote in 1980, unless an earlier date is fixed by legislative action.
 Respectfully,
 FREDERICK B. KARL
 JAMES C. ADKINS
 Justices
NOTES
[1] "Great cases, like hard cases, make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." Northern Sec. Co. v. United States, 193 U.S. 197, 400-401, 24 S.Ct. 436, 48 L.Ed. 679 (1904) (Holmes, J., dissenting).
[2] E.g., In re Advisory Opinion to Governor, 243 So.2d 573 (Fla. 1971); In re Advisory Opinion to Governor, 223 So.2d 35 (Fla. 1969).
[1] See commentary by Talbot "Sandy" D'Alemberte on Article XI, Section 2, Florida Constitution, 26A F.S.A. 548.
[2] The Constitution of the United States has never been completely revised or rewritten and has been amended only twenty-six times.
[3] Article XI, Section 5, Florida Constitution.
[4] The people did not, however, express a desire to bypass the legislative branch. The President of the Senate and the Speaker of the House appoint eighteen of the thirty-seven members of the commission, and they could all be legislators. There is no prohibition against legislators being placed on the commission by other appointing authorities.
[5] Article XI, Section 5, Florida Constitution.