ROBERT L. CAULFIELD *v.* HENRY S. NOBLE ET AL.

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, JS.

Argued December 5, 1978—decision released June 26, 1979

*Robert L. Caulfield,* pro se, the appellant (plaintiff).

*George C. Hastings,* with whom, on the brief, was *Ira Hicks,* for the appellees (defendants).

LONGO, J. The plaintiff, a resident and taxpayer of the town of New Canaan, appeals from a judgment of the Superior Court denying his application for a writ of mandamus in which he sought, inter alia, to compel the defendant selectmen, tax collector and members of the New Canaan board of finance to fix a new mill rate for the town for the fiscal year 1977, which began September 1, 1976.

The essential facts, as stipulated by the parties in the trial court and disclosed in the court's finding, reveal the following: On October 19, 1976, the board of finance of New Canaan met in official session and fixed the mill rate to be applied to the grand list for the town for fiscal 1977 at 46.3 mills. In December, 1976, the audit of the fiscal year ending August 31, 1976 was completed and showed a general fund surplus amount available for appropriation ultimately tabulated to be $639,467.66. In setting the mill rate at 46.3 for fiscal 1977, the board of finance did not apply any of the general fund surplus available for appropriation toward the amount to be raised by taxation for fiscal 1977, under the authority of § C5-28 of the New Canaan charter, which reads in pertinent part as follows: "[u]nexpended cash balances remaining at the end of any fiscal year may, by resolution of the Board of Finance, be either transferred to a surplus account or subtracted from the amount the Town Council has authorized to be raised by taxation for the ensuing fiscal year." The town selectmen later imposed a tax based on the 46.3 mill rate.

The plaintiff filed suit in January, 1977, claiming that the defendants had wrongfully set the mill rate and corresponding real property tax for fiscal 1977, and sought relief by way of a judgment of

mandamus, basing his contentions on § 7-344[1] of the General Statutes as interpreted by the Superior Court in *Holmes* v. *Beckwith,* 11 Conn. Sup. 215 (1942), in which the court interpreted § 7-344 to mean that a cash surplus in the general fund at the end of the fiscal year should be applied in reducing the amount of the estimated expenditures for the ensuing year in order to determine the rate of tax to be layed upon the taxable property for such year.

The trial court disagreed, finding that the board of finance had properly acted in accordance with its charter, § C5-28, in setting the mill rate for fiscal 1977 and in not applying the general fund surplus in reduction of the amount to be raised by taxation in fiscal 1977; that neither General Statutes § 7-344 nor the decision in *Holmes* v. *Beckwith,* supra, controlled over the specific authority of § C5-28 of the charter; that since § C5-28 of the charter was enacted after the predecessor of § 7-344 of the General Statutes the former provision was controlling; and that there was no judicial presumption in favor of the plaintiff's claim that § C5-28 was preempted by § 7-344 of the General Statutes. From the rendition of judgment in favor of the defendants, the plaintiff has appealed to this court.

---

[1] General Statutes § 7-344 provides, in pertinent part: ". . . Immediately after the board of tax review has finished its duties and the grand list has been completed, the board of finance shall meet and, with due provision for estimated uncollectible taxes, abatements and corrections, shall lay such tax on such list as shall be sufficient, in addition to the other estimated yearly income of such town and in addition to such revenue surplus, if any, as may be appropriated, not only to pay the expenses of the town for such current year, but also to absorb the revenue deficit of such town, if any, at the beginning of such current year. . . ."

## I

The plaintiff first assigns error in the failure of the trial court to take account of the claimed "judicial presumption" in favor of taxpayers set forth in this court's decision in *Levin-Townsend Computer Corporation* v. *Hartford,* 166 Conn. 405, 409, 349 A.2d 853 (1974), in which it was stated that "[d]oubts as to the taxing authority of the municipality must be resolved in favor of the taxpayer." It appears that the plaintiff argues that a presumption of validity attaches to his claim that § C5-28 of the New Canaan charter is preempted by § 7-344 of the General Statutes. The answer to the plaintiff's argument in this respect may be found by referring to the source of the above quotation; *Curtis* v. *Corbin,* 93 Conn. 648, 657, 107 A. 506 (1919); in which this court stated that any judicial presumption in favor of a taxpayer's suit is limited to cases of clear statutory ambiguity: "The mere fact that there may be differences of opinion, so that a judicial determination has to be obtained, or that one construction may lead to a heavier tax than another, is not enough. We think this doctrine applies only in case of a clear ambiguity in language which substantially leaves the statute equally open to different interpretations . . . ." In the present case there is "clear ambiguity" in neither § C5-28 of the charter nor § 7-344 of the General Statutes. Cf. *Hartford Electric Light Co.* v. *Wethersfield,* 165 Conn. 211, 219, 332 A.2d 83 (1973); *Consolidated Diesel Electric Corporation* v. *Stamford,* 156 Conn. 33, 36, 238 A.2d 410 (1968). In contrast, the plaintiff merely seeks a judicial determination as to which law controls the activities of the New Canaan board of

finance in connection with the disposition of the cash surplus and the setting of a corresponding mill rate for fiscal 1977. If the result of that determination disfavors the plaintiff, a heavier tax may follow. In such circumstances, no judicial presumption of validity attaches to the plaintiff's claims. *Curtis* v. *Corbin,* supra, 657.

## II

The plaintiff next claims that the town is required under General Statutes § 7-344 and the decision in *Holmes* v. *Beckwith,* 11 Conn. Sup. 215 (1942), to apply a cash surplus accumulated at the end of any fiscal year in reduction of the rate of tax to be levied for the following year. The defendants respond that § C5-28 of the town charter authorizes them, under a proper interpretation of municipal authority under the Home Rule Act, General Statutes §§ 7-187—7-201, and as a matter of statutory construction, either to retain a year end surplus in a surplus account or to apply the surplus to reduce the amount of revenue to be raised by taxes in the ensuing fiscal year.

## A

We appear not to have addressed the precise issue whether the local autonomy conferred upon municipalities by the Home Rule Act to govern, inter alia, matters of real property taxation and the fixing of a corresponding mill rate ought to supersede the provisions of a related section of the General Statutes dealing with the scope of municipal authority to tax.[2] The purpose, however, of Con-

---

[2] Home rule legislation in Connecticut was first enacted in 1915. Public Acts 1915, No. 319, entitled "An Act providing for Home Rule in Towns, Cities and Boroughs." This first enactment was, however, short lived; the original act was repealed in 1929, by

necticut's Home Rule Act is clearly twofold: to relieve the General Assembly of the burdensome task of handling and enacting special legislation of local municipal concern and to enable a municipality to draft and adopt a home rule charter or ordinance which shall constitute the organic law of the city, superseding its existing charter and any inconsistent special acts. General Statutes § 7-188; *Sloane* v. *Waterbury,* 150 Conn. 24, 26–27, 183 A.2d 839 (1962) ; *State ex rel. Sloane* v. *Reidy,* 152 Conn. 419, 209 A.2d 674 (1965) ; *Shalvoy* v. *Curran,* 393 F.2d 55, 59 (2d Cir. 1968) ; see Littlefield, "Municipal Home Rule — Connecticut's Mature Approach," 37 Conn. B.J. 390, 402 (1963) ; 56 Am. Jur. 2d, Municipal Corporations § 126; 62 C.J.S., Municipal Corporations § 124. The rationale of the act, simply stated, is that issues of local concern are most logically answered locally, pursuant to a home rule charter, exclusive of the provisions of the General Statutes.[3] See Lock-

---

Public Acts 1929, No. 247. The legislation was revived in 1951; Public Acts 1951, No. 338; and redrafted in 1957; Public Acts 1957, No. 465; into its present form, General Statutes §§ 7-187—7-201. Little, however, has been written in our cases concerning the scope of municipal power under the Home Rule Act. Compare *Rothkopf* v. *Danbury,* 156 Conn. 347, 242 A.2d 771 (1968), with *State ex rel. Barnard* v. *Ambrogio,* 162 Conn. 491, 294 A.2d 529 (1972) (the former case involving a constitutional attack on the organization of Danbury as a municipal corporation under the Home Rule Act; the latter holding that the Home Rule Act did not empower a municipality to establish or amend a civil service commission) ; see *Sloane* v. *Waterbury,* 150 Conn. 24, 183 A.2d 839 (1962) (procedure for local amendment of city charters contained exclusively in the Home Rule Act) ; *State ex rel. Sloane* v. *Reidy,* 152 Conn. 419, 209 A.2d 674 (1965) ; *Dugas* v. *Beauregard,* 155 Conn. 573, 236 A.2d 87 (1967).

[3] In contrast, it has been held that when a charter provision and a statute of general application both enter a field of statewide concern, the local charter power must yield to the superior power of the state. See *Larke* v. *Morrissey,* 155 Conn. 163, 174, 230 A.2d 562

ard, "Home Rule for Connecticut's Municipalities," 29 Conn. B.J. 51, 54 (1955). Moreover, home rule legislation was enacted "to enable municipalities to conduct their own business and control their own affairs to the fullest possible extent in their own way . . . upon the principle that the municipality itself knew better what it wanted and needed than did the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs." *Fragley* v. *Phelan,* 126 Cal. 383, 387, 58 P. 923 (1899); accord 1 Antieau, Municipal Corporation Law, § 3.03; 1 McQuillin, Municipal Corporations (2d Ed.) § 93.

In furtherance of this stated goal of home rule legislation, it has been held that a general law, in order to prevail over a conflicting charter provision of a city having a home rule charter, must pertain to those things of general concern to the people of the state, and it cannot deprive cities of the right to legislate on purely local affairs germane to city purposes. *Portland* v. *Welch,* 154 Or. 286, 59 P.2d 228 (1936); see 62 C.J.S., Municipal Corporations § 125; 5 McQuillin, Municipal Corporations (3d Ed. 1969 Rev.), § 15.20 (issues relating strictly to municipal affairs are within the exclusive delegated power of municipalities coming under home rule). In the numerous jurisdictions having either constitutional or legislative municipal home rule, the overwhelming view accords to the municipality the fullest extent of home rule authority, consistent with law, in matters of local concern. See, e.g., Littlefield, "Munici-

(1967); *Wallingford* v. *Board of Education,* 152 Conn. 568, 574, 210 A.2d 446 (1965); *Delinks* v. *McGowan,* 148 Conn. 614, 623, 173 A.2d 488 (1961); *Jennings* v. *Connecticut Light & Power Co.,* 140 Conn. 650, 664, 103 A.2d 535 (1954).

pal Home Rule—Connecticut's Mature Approach," supra; Klemme, "The Powers of Home Rule Cities in Colorado," 36 Colorado L. Rev. 321 (1964).[4]

## B

Against this background, we must decide whether the town was authorized to withhold the general fund surplus available for appropriation for fiscal 1977, pursuant to § C5-28 of the town charter, and to impose a corresponding mill rate, notwithstanding the provisions of § 7-344 of the General Statutes, and its interpretive decision, *Holmes* v. *Beckwith,* 11 Conn. Sup. 215 (1942). We have determined that the town was authorized, pursuant to its charter, to withhold the general fund surplus, and to set a corresponding mill rate.

It is axiomatic that, in Connecticut, the power to levy taxes is vested in the General Assembly; *Kellems* v. *Brown,* 163 Conn. 478, 487, 313 A.2d 53 (1972), appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 (1973); that a municipality has no inherent powers of taxation except those expressly granted by the legislature; *Pepin* v. *Danbury,* 171 Conn. 74, 83, 368 A.2d 88 (1976); that the General Assembly is empowered to authorize municipalities to collect taxes, for example, by granting them a charter; *State ex rel. Brush* v.

---

[4] Commentators in the majority of jurisdictions we have examined share the same view. See, e.g., Sentell, "Home Rule Benefits or Home-made Problems for Georgia Local Government?" 4 Ga. S.B.J. 317 (1968); note, "Municipal Home Rule in Iowa: House File 380," 49 Iowa L. Rev. 826 (1964); Martin, "Home Rule for Kansas Cities," 10 Kan. L. Rev. 501 (1962); note, "Municipal Home Rule for Kentucky?" 54 Ky. L.J. 757 (1966); note, "Home Rule and Special Legislation in Minnesota," 47 Minn. L. Rev. 621 (1963); note, "Home Rule and the New York Constitution," 66 Columbia L. Rev. 1145 (1966); Westbrook, "Municipal Home Rule: An evaluation of the Missouri Experience," 33 Mo. L. Rev. 45 (1968).

*Sixth Taxing District,* 104 Conn. 192, 198–99, 132 A. 561 (1926) ; and that a municipality's powers of taxation can be lawfully exercised only in strict conformity to the terms by which they are given. *Low Stamford Corporation* v. *Stamford,* 164 Conn. 178, 182, 319 A.2d 369 (1972). Whether a charter provision, however, relating to taxation and the appropriation or withholding of a general fund surplus prevails over a general statute on the subject depends upon a construction of applicable laws and the policy of the state relating to the matter. 16 McQuillin, Municipal Corporations (3d Ed.) § 44.06 ; 56 Am. Jur. 2d, Municipal Corporations § 129.

When the applicable laws are construed, it is apparent that the predecessor of the present New Canaan charter, "An Act Consolidating the Town and Borough of New Canaan" was enacted by special act of the legislature on June 4, 1935. 22 Spec. Laws 229, No. 389. Section 37 of this act, the predecessor of § C5-28 of the present charter, authorized the board of finance either to transfer unexpended cash balances (surpluses) remaining at the end of a fiscal year to a surplus account, or to deduct the surplus from the amount to be raised by taxation for the ensuing fiscal year. This special act was enacted after the predecessor of § 7-344 of the General Statutes, which was originally passed as 1931 Public Acts, No. 268, amending § 418 of the 1930 Revision of the General Statutes. Thereafter, on November 5, 1974, pursuant to the home rule legislation, General Statutes § 7-188,[5] a codification of the

---

[5] General Statutes § 7-188 provides, in part: "INITIATION OF ACTION FOR ADOPTION OR AMENDMENT OF CHARTER OR HOME RULE ORDINANCE. Any town, city or borough, in addition to such powers as it has under the provisions of the general statutes or any special act, shall have the power to draft, adopt and amend a charter which

existing charter was approved by the town, incorporating the former § 37 of the special act as § C5-28 of the new charter.

From a reading of the provisions of the Home Rule Act, General Statutes §§ 7-187—7-201, it is evident that the legislature intended to give "home rule towns" the freedom to retain aspects of special acts and charters suited to particular local needs and practices. This court has stated, moreover, that, consistent with home rule legislation, the policy of this state has been "to place in the hands of its local governments a large authority in the regulation of their local affairs." *Jennings* v. *Connecticut Light & Power Co.,* 140 Conn. 650, 663, 103 A.2d 535 (1954) ; *Central Railway & Electric Co.'s Appeal,* 67 Conn. 197, 219, 35 A. 32 (1896) ; cf. *State* v. *Cederaski,* 80 Conn. 478, 480, 69 A. 19 (1908).[6]

The courts that have considered the issue have almost uniformly held that the imposition of real property taxes, a matter concerning the ordinary town corporate budget, incidental to the existence of the organized municipal corporation, is a local matter, concerning which home rule charter provisions are controlling. See *West Coast Advertising Co.* v. *San Francisco,* 14 Cal. 2d 516, 95 P.2d 138

shall be its organic law and shall supersede any existing charter, including amendments thereto, and all special acts inconsistent therewith, and to adopt a home rule ordinance in substitution for a special act relating to its government . . . ."

[6] This policy, as it relates to home rule legislation, has been specifically identified, in one commentator's view, as indicating that home rule charters may provide for the government of a municipality, irrespective of patterns established by general or special acts. Littlefield, "Municipal Home Rule — Connecticut's Mature Approach," 37 Conn. B.J. 390, 400–401 (1968). This view seems appropriate as to matters of municipal authority over purely local issues.

(1939); *State* v. *Erickson,* 157 Minn. 200, 195 N.W. 919 (1923); *People* v. *Village of Pelham,* 215 N.Y. 374, 109 N.E. 513 (1915); *Portland* v. *Welch,* 154 Or. 286, 59 P.2d 288 (1936); 16 McQuillin, Municipal Corporations (3d Ed. 1972 Rev.) § 44.06a; 56 Am. Jur. 2d, Municipal Corporations § 129. As a corollary to this rule, the great majority of home rule states have accepted the principle that general laws pertaining to municipal affairs, such as decisions with respect to the appropriation of surplus revenues, as distinguished from state affairs—those in which the interests of the state dominate—do not supersede the provisions of home rule charters or ordinances on the same subject. See 6 McQuillin, Municipal Corporations (3d Ed. 1969 Rev.) § 21.33; 5 McQuillin, Municipal Corporations (3d Ed. 1969 Rev.) § 15.20; annot., 106 A.L.R. 1202, 1205.[7]

These authorities, and the following considerations, dictate that New Canaan, under the authority of § C5-28 of its charter, is empowered to withhold a general fund surplus in a surplus account and that its authority in this regard is not limited by the decision in *Holmes* v. *Beckwith,* 11 Conn. Sup. 215 (1942), interpreting § 7-344 of the General Statutes. First, the decision in *Holmes,* cannot be construed as binding upon the issues in this case. In *Holmes,* interpreting General Statutes § 7-344, the court held that, "in the absence of statutory authority," a cash

---

[7] Once again, the authorities we have examined support this view. See, e.g., McDonald, American City Government and Administration, p. 79 (3d Ed. 1941); Cohn, "Municipal Revenue Powers in the Context of Constitutional Home Rule," 51 Nw. U. L. Rev. 27 (1956); Mott, "Strengthening Home Rule," 39 Natl. Mun. Rev. 172 (1950); note, "Conflicts between State Statutes and Municipal Ordinances," 72 Harv. L. Rev. 737 (1959); Fordham, "Decision-Making in Expanding American Urban Life," 21 Ohio St. L.J. 274 (1960).

surplus in the general fund at the end of the fiscal year should be applied in reducing the amount of the estimated expenditures for the ensuing year in order to reduce the levy upon the taxpayer's property. The court was not confronted, as we are in the present case, with a local home rule charter, i.e., statutory authority, expressly authorizing the retention of surplus revenues in a surplus account. The *Holmes* case simply did not address the issues presented where a conflict exists between a general statute and a town charter both dealing with the subject of appropriating revenue surpluses; it is thus not controlling.[8]

Second, the allocation of power between legislature and municipality must be made in accordance with the purpose of the home rule legislation which vested in the cities a part, and an exclusive part, of the power to legislate free from the control of the General Assembly. That purpose, as we pointed out initially, was to make operative the concept that the closer those who make and execute the laws are to the citizens they represent, the better are those citizens governed in accordance with democratic ideals. That objective would be disserved if we should decide that the General Assembly preempts the field each time it makes a statute of general

---

[8] We note that § 7-344 provides, in pertinent part, that a board of finance must lay a tax "in addition to such revenue surplus, if any, as may be appropriated . . . ." The court in *Holmes* evidently interpreted this language as imposing a mandatory duty on a board of finance to appropriate a revenue surplus. The statute, however, by its use of the word "may" appears to impose only a discretionary duty upon a board to appropriate a surplus of revenue. In view of our decision deeming the statutory interpretation of *Holmes* inapplicable to the present case, we, of course, take no position as to the correctness of the *Holmes* decision.

application. The legislative recognition that municipalities have autonomy to govern local matters, such as the raising of revenue by real property taxation, counsels that the specific and express provisions of § C5-28 of the town charter control the present controversy.

Finally, as a pure matter of statutory construction, "[t]here is a presumption that the legislature, in enacting a law, did so in view of existing relevant statutes and intended it to be read with them so as to make one consistent body of law." *Hurlbut* v. *Lemelin,* 155 Conn. 68, 74, 230 A.2d 36 (1967) ; *Cicala* v. *Administrator,* 161 Conn. 362, 365, 288 A.2d 66 (1971). Here, the predecessor of § 7-344 of the General Statutes was enacted prior to the predecessor of § C5-28 of the town charter, and there is no indication that the legislature intended the statute to prevail in the face of the specific provisions of the local charter. Thus, in accordance with accepted principles of statutory construction, the provisions of the charter must prevail. 82 C.J.S., Statutes, § 369; 62 C.J.S., Municipal Corporations § 198; *State ex rel. Wallen* v. *Hatch,* 82 Conn. 122, 124, 72 A. 575 (1909) ; see *Waterbury Teachers Assn.* v. *Furlong,* 162 Conn. 390, 404, 294 A.2d 546 (1972); *Meriden* v. *Board of Tax Review,* 161 Conn. 396, 402, 288 A.2d 435 (1971). Even in the absence of the persuasive conception of home rule municipal authority we have adverted to above, we must conclude as a matter of statutory construction that the specific language of § C5-28 of the charter prevails over the provisions of § 7-344 of the General Statutes.

In sum, we hold that the defendant board of finance acted properly pursuant to § C5-28 of the town charter in withholding the fiscal 1976 revenue surplus and in not applying it to reduce the amount of estimated expenditures for fiscal 1977.[9]

## III

The plaintiff next makes a number of interrelated claims focusing upon the town's retention of its year end surplus. They will be discussed seriatim.

## A

The plaintiff first asserts that General Statutes §§ 7-191a and 7-192 preclude the town from exercising any power to levy or collect any tax not authorized by the General Statutes, arguing that § C5-28 of the town charter contains no express grant of taxing power, and if so interpreted, directly conflicts with that section of § 7-192 which provides: "Nothing contained in this chapter shall empower any town, city or borough to levy or collect any tax not authorized by the general statutes." The plaintiff's argument appears to be that since the town held the year end surplus in a surplus account, rather than applying it to reduce the mill rate, it was exercising an unauthorized taxing power in violation of § 7-192. We disagree. A levying body has considerable discretion in the composition of the municipal budget; 72 Am. Jur. 2d, State and Local Taxation § 714; and the mere retention of a

---

[9] As we have indicated above, the state, as the source of taxing authority, has the power expressly to limit the scope of the taxing power conferred upon municipalities under the Home Rule Act. Such a statute, if enacted to apply generally to home rule towns, would, of course, prevail over inconsistent provisions in a municipality's charter.

cash surplus created in one fiscal year is not the exercise of a taxing power as to the effect the retention has on the ensuing fiscal year. 16 McQuillin, Municipal Corporations (3d Ed. 1972 Rev.) § 44.25. In view of the specific authority of § C5-28 of the charter, the board of finance, in fixing the mill rate for the fiscal 1977, was not required to take into account the existing cash surplus. See 16 McQuillin, supra; *Rancho Santa Anita, Inc.* v. *City of Arcadia,* 20 Cal. 2d 319, 125 P.2d 475 (1942); *State* v. *Powers,* 24 N.J.L. 408 (1854); *People ex rel. Stevenson* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 261 Ill. 33, 103 N.E. 614 (1913); *People ex rel. Browne* v. *Chicago & E.I. Ry. Co.,* 306 Ill. 402, 138 N.E. 127 (1923); annot., 126 A.L.R. 891, 892. These authorities point out that the mere retention of a surplus, pursuant to statutory authority, is not the exercise of a taxing power and that the mere fact that in setting the amount to be levied by taxation, the town has levied an amount greater than its actual requirement, does not allow a taxpayer to challenge the mill rate, unless the amount levied is grossly excessive so as to show an improper purpose in making the levy.

It is thus apparent that the town, by retaining a cash surplus, did not authorize a tax in conflict with § 7-192 of the General Statutes. Many actions that a municipality may take, short of taxation, such as applying for a federal grant or not, affect the amount of money to be raised by taxation. This alone, however, does not make those actions the exercise of a taxing power. A multitude of factors influence the amount of revenues a town raises by taxation. The charter merely authorizes the retention of a cash surplus, having an incidental effect on the mill rate. We do not believe that such a retention is the exercise of a taxing power.

## B

The plaintiff finally argues that whatever authority is granted by § C5-28 of the town charter is limited to "unexpended cash balances, remaining at the end of any fiscal year" and can include neither a surplus created in prior years and carried over, nor the excess of actual revenues over budgeted revenues.[10] We cannot agree with the plaintiff's interpretation that the term "unexpended cash balances remaining" does not include the surplus from prior years, and the excess of revenue on hand over that budgeted. The plaintiff has cited no authority for his interpretation of the term "unexpended cash balances remaining"; neither did he offer evidence, expert or otherwise, on the meaning of this term in the trial court. Nonetheless, it would appear that both items are within the fair intendment of § C5-28 of the charter. It has, moreover, been held that an available surplus means any cash surplus remaining in the current expense fund at the beginning of the fiscal year. *Weyerhaeuser Timber Company* v. *Roessler,* 2 Wash. 2d 304, 97 P.2d 1070 (1940). We find no error in the decision of the trial court including these two items in the town's "unexpended cash balances remaining" at the end of fiscal 1976.

There is no error.

In this opinion BOGDANSKI and PETERS, Js., concurred.

---

[10] The sources of the surplus of $639,467.66 available for appropriation in fiscal 1977 were as follows:

| | |
|---|---|
| 1. Prior years surplus | $134,512.95 |
| 2. Excess of actual revenues over budgeted | 342,304.65 |
| 3. Unencumbered appropriation balances | 119,772.06 |
| 4. Unencumbered prior years' appropriation balances | 42,928.00 |

LOISELLE, J. (dissenting). The issue which threads through this case transcends that discussed in the majority opinion. Although not pinpointed in the complaint, it is implicit as the basis of the plaintiff's action. This issue is whether a town has the right to accumulate tax revenues when it is not shown that such accumulation is for a public purpose even though there is charter authority to do so.

It is unquestioned that the $639,467.66 surplus was not earmarked for any current or future expenditure and was available for appropriation as of the close of the fiscal year ending August 31, 1976. The town refused to put this general fund amount for appropriation on hand as of August 31, 1976, toward the amount to be raised by taxation for the fiscal year beginning September 1, 1976. Their action, as stated in the majority opinion, was to transfer this sum to a "surplus account" as authorized by the town's charter. The finding is explicit that this sum "available for appropriation was and is separate and distinct from the Reserve Fund for Capital and Non-Recurring Expenditures" maintained by the town. The finding that the amount of money in question was not for capital or non-recurring expenditures that might occur in the future and the further fact found that it was transferred to a surplus account certainly is sufficient proof that the amount of money in question was put aside with no purpose other than accumulation. This conclusion is further fortified by the fact that the case was submitted on a stipulation of facts and that neither the stipulation nor the finding made by the court could reasonably support a contrary conclusion, except by guess or speculation.

The power to tax is an incident of the sovereignty of the state. *International Harvester Co.* v. *Wis-*

*consin Dept. of Taxation,* 322 U.S. 435, 444, 64 S. Ct. 1060, 88 L. Ed. 1373 (1944); *M'Cullock* v. *Maryland,* 17 U.S. (4 Wheat.) 316, 429, 4 L. Ed. 579 (1819); 71 Am. Jur. 2d, State and Local Taxation § 71. "[T]he two elements upon which the power of taxation must rest [are] a public purpose and a public exigency . . . ." 71 Am. Jur. 2d, State and Local Taxation § 77. As to the latter basis, the legislative determination is broad indeed. See *Kellems* v. *Brown,* 163 Conn. 478, 313 A.2d 53 (1972), appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 (1973). As to the first basis, the determination of a public purpose is subject to judicial review. *People ex rel. McDavid* v. *Barrett,* 370 Ill. 478, 19 N.E.2d 356 (1939). The tests for determining whether a public purpose is present stem from *Loan Association* v. *Topeka,* 87 U.S. (20 Wall) 655, 663, 22 L. Ed. 455 (1874), and this court has used these tests in its own determination of this issue. See *Baker* v. *West Hartford,* 89 Conn. 394, 399, 94 A. 283 (1915); *Walsh* v. *Jenks,* 135 Conn. 210, 223, 62 A.2d 773 (1948).

"Every definition of 'taxation' expressly or impliedly asserts that it is to be imposed only for public purposes. This is a foundation principle of all constitutional government. . . . A republican form of government forbids the raising of taxes for any but public purposes, and under Article Fourth, Section 4, of the Constitution of the United States, Connecticut is forever bound to maintain such form of government, and cannot exercise legislative power inconsistent with it." *Beach* v. *Bradstreet,* 85 Conn. 344, 348, 349, 82 A. 1030 (1912). "A tax is a public burden imposed by law upon the individual for a public purpose." *Cromwell* v. *Savage,* 85 Conn. 376, 377, 82 A. 972 (1912); *Hartford* v. *Connecticut Co.,*

107 Conn. 312, 332, 140 A. 734 (1928). It is unquestioned that in this state, taxation may only be imposed for a public purpose and that a cardinal principle of taxation is that taxes may not be levied beyond the needs of government. See *Moore* v. *Langton,* 92 R.I. 141, 151–52, 167 A.2d 558 (1961).

Accumulation of tax funds where the only apparent purpose is to accumulate is taxation without a public purpose. "Taxes are levied because they are necessary to defray the expenses of government and not for the purpose of enriching the public treasury. Taxing authorities, therefore, will not be permitted to levy taxes faster than they are likely to be needed. An unnecessary accumulation of money in the public treasury is unjust, impolitic and against the policy of the law." *Cities Service Oil Co.* v. *Carter,* 247 La. 974, 984, 175 So. 2d 288 (1965); *People ex rel. Brenza* v. *Morrison Hotel Corporation,* 4 Ill. 2d 542, 547, 123 N.E.2d 488 (1954); *People ex rel. Kramer* v. *Chicago, Burlington & Quincy R. Co.,* 8 Ill. 2d 382, 387, 134 N.E.2d 335 (1956); 84 C.J.S., Taxation § 352 c (3).

Although not specifically or expressly stated, the stipulation of facts and finding indicate that the $639,467.66 was transferred to a surplus account and the defendant builds its whole defense on the basis of the charter right to transfer such monies to a "surplus" account. As this amount was purely an accumulation for no public purpose, it was invalid and beyond the power of the town to do despite charter authorization.

This dissenting opinion is not to be construed as stating that there can be no accumulation of tax monies by a municipality where there is statutory authority to do so for a public purpose that is rea-

sonably anticipated or for sinking funds, or payments of public purpose debts that are to accrue in the future. See General Statutes § 7-389, where specific authority is granted for accumulation of funds to ease the transition of towns to a fiscal year. Such accumulations are for public purposes and would be a valid exercise of the sovereign power to tax. In the instant case, there is no evidence of this. Reduced to the essentials, the town accumulated monies not earmarked for any purpose and put them aside for some undefined future use. I maintain that that is illegal and an abuse by the town of its taxing power.

I respectfully dissent.

In this opinion COTTER, C. J., concurred.