[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This declaratory judgment action requires the court to consider two strands of Connecticut case law and what happens when they intersect. The controversy arises out of the adoption by the voters of Naugatuck of two amendments to the borough's charter, one having to do with the manner in which the Board of Education's budget is adopted each year (the "budget amendment") and the other having to do with the membership of the Board of Education (the "membership amendment").
The first strand of cases which the court must consider are those having to do with the interrelationship between local boards of education and local budgeting authorities. The second strand has to do with the powers of local government, in particular the budgeting powers, under the Home Rule Act, chapter 99 of the General Statutes, and other statutes defining the powers of local government. See generally Title 7 of the General Statutes.
The action has been brought by the board of education (the board) of the Town and Borough of Naugatuck against the town, itself, and various officeholders in the town, including the mayor, all of whom will be referred to collectively as "the town". Both sides have filed motions for summary judgment and have stipulated to the facts underlying their dispute. Thus, there is no genuine issue as to any material fact and the question may be resolved purely as a matter of law. See P.B. § 17-49. In brief, the board claims that these two amendments to the charter are illegal and invalid in that they exceed the town's powers under the Home Rule Act or any other statutory authorization.
The court cannot blink the seriousness of what the board is asking it to do. These charter amendments were adopted by sizeable majorities of the voters at the election of November 5, 1996.[1] This is, after all, a democracy, and courts should be reluctant to strike down laws in the form of town charter provisions which represent the clear will of the voters. The fundamental purpose of home rule legislation "was to make operative the concept that the closer those who make and execute the laws are to the citizens they represent, the better are those citizens governed in accordance with democratic ideals". CT Page 11109Caulfield v. Noble, 178 Conn. 81, 92 (1979). The court must be mindful of this purpose in evaluating local legislation in response to a claim that it is invalid because it contravenes state general laws.
This judicial deference is recognized in the well-known presumption of constitutionality accorded to all legislative enactments and the "heavy burden" of proving unconstitutionality beyond a reasonable doubt. See State v. Angel C., 245 Conn. 93,102 (1998). In this case, however, no such presumption is involved since the amendments are not being challenged on constitutional grounds; therefore, the board carries no heightened burden in sustaining its challenge. "The issue here is purely a question of statutory interpretation. It is the general rule that an ordinance is presumed valid; where, however, the power of the municipality to pass the ordinance is not clear, no such presumption attaches. 56 Am.Jur.2d Municipal Corporations 382," New Haven Commission v. Yale University, 183 Conn. 495, 499
(1981).
 1. The Facts
In accordance with the stipulation of the parties, I find the undisputed facts to be as follows. In 1895 the Connecticut General Assembly enacted Special Act Number 185, the provisions of which were incorporated into and codified as the borough's charter, thereby becoming the borough's "organic law". Caulfieldv. Noble, 178 Conn., supra, 86. Section 3.18 of the borough charter, a copy of which is attached to this Memorandum as Exhibit A, prescribes the number of board of education members, the method of their election and the length of their terms. Section 14 of the charter, a copy of which is attached to this memorandum as Exhibit B, sets forth, inter alia, the process by which the borough's electors can seek a referendum on the proposed borough budget, which budget includes both the borough's operating budget and the board's annual budget.
These two sections of the charter were amended by the electors on November 5, 1996. Following that election the mayor and other town officials took affirmative steps to give effect to these amendments, hence their status as defendants.
 2. Stipulations
Commendably, the parties have attempted to clear away the CT Page 11110 underbrush surrounding the central issues by entering into several agreements. The defendants have stipulated that the plaintiff has standing to pursue this matter, and the court so finds. The plaintiff has agreed not to pursue any claims that the defendants have failed to comply with any statutory procedural requirements and, although the defendants, in a stipulation entered into by the parties on March 6, 1998, reserved the right to argue that the issues presented in this action are political issues that are not justiciable, and that the exclusive remedy of the plaintiff is through the electoral process, they did not present such arguments in their brief or at oral argument, and the court considers those issues abandoned. Cf. Schwarzschild v.Martin, 191 Conn. 316, 320 n. 7 (1983). The parties have further stipulated, and the court finds that there are actual bona fide and substantial questions in dispute concerning the charter amendments that have led to uncertainty as to the parties' rights and relations and which require resolution, and that the challenge to these provisions presents a live controversy.
The defendants have stipulated that the plaintiff has complied with § 17-55 of the Practice Book, and that all appropriate parties who may have an interest in the subject matter of this case have been served or have received reasonable notice thereof. Since this is a jurisdictional matter, the court must make its own finding in this regard. See Canavan v. Messina,31 Conn. Sup. 447, 449-50 (1973). A review of the file indicates that, when the action was first filed in March 1997, the court (Pellegrino, J.) issued an order of notice, requiring that notice by certified mail be given to various state officials who might have an interest in the case, and that notice by publication be given to the residents and taxpayers of Naugatuck. The order specifically provided that notice given by the plaintiff in accordance therewith would be sufficient to comply with the provisions of § 17-55 of the Practice Book. The file reflects due compliance with this order of notice. Therefore, I find that the parties have complied with § 17-55 of the Practice Book, and that "all persons having an interest in the subject matter of the complaint" are either parties in this action or had reasonable notice thereof.
Finally, all parties have agreed that the court's ruling on their cross motions for summary judgment will be dispositive of all procedural and substantive issues in this case.
 3. The Budget Amendment CT Page 11111
Section 14 of the borough charter is printed in full as Exhibit B to this memorandum, showing its provisions both before and after the amendment adopted by the voters on November 5, 1996.[2] Both before and after the amendment, Section 14 set forth the procedure by which the board of finance and the board of mayor and burgesses adopt a budget for the town, including the holding of a public hearing on the budget as recommended by the boards, its publication in a newspaper prior to the public hearing and a procedure for the voters to petition for a referendum on the budget. The significant change effected by the November 1996 amendment was to permit the electors to petition for separate votes on the town's "operating budget" (the "non-board of education budget"), and/or the board of education budget. Under the charter prior to the amendment the electors could vote only on the town's budget as a unit, including the board's budget. Now the electors can petition for a vote separately on each of the two budgets, the "operating budget" and the board's budget, or on only one of them. Obviously, the electors can, therefore, reject both budgets or reject only one of them; e.g. the board's budget, while leaving the other budget intact.
In language retained without amendment, Section 14 provides that if "the total votes to reject exceeds (sic) the vote to accept, the budget shall be deemed rejected". The board of finance and the board of mayor and burgesses must then present a "revised budget" at a public hearing and adopt such a revised budget within 14 days from the date of the referendum in which "the budget" was rejected. A total of three such referenda may be held on either or both budgets.[3]
It is the plaintiff's position that this amended charter provision provides effectively for two separate budgets, one of which is the board's annual budget, in violation of § 7-344, C.G.S.[4] The defendants respond that, while there may be two separate budget questions, there is only one budget approved when both budget questions are approved, and that, if one budget question is rejected, the entire budget, both the "operating budget" and the board's budget, is considered rejected and must be re-adopted.[5] The defendants claim the power to adopt such a procedure for voting on the budget under §§ 7-194 and 7-148, C.G.S.[6]
According to the board, the vice in this provision is that it CT Page 11112 singles out the board's budget for special scrutiny by the voters, scrutiny not provided for as to any other agency covered by the town's budget. Furthermore, it exposes the board's budget, alone and in toto, to rejection by the voters at the same time as the remainder of the town's budget is approved. Thus, it effectively disadvantages the board's budget vis-a-vis the budgets of all other town agencies and offices in a way not permitted by the General Statutes, and, in fact, prohibited by the special status to be accorded public education in Connecticut.
Any consideration of the issues raised by this charter amendment must begin with a recognition that the "command of the state constitution places the ultimate responsibility for the education of the children of Connecticut on the state". New Havenv. State Board of Education, 228 Conn. 699, 702 (1994). This "constitutional mandate", Board of Education v. New Haven,237 Conn. 169, 174 (1996), stems from article 8, 1 of the constitution of Connecticut adopted in 1965.[7] Thus, "the furnishing of an education for the public is a state function and duty". Cheshire v. McKenney, 182 Conn. 253, 257 (1980).
By statute[8] the duty to provide and administer public education has been delegated to local and regional boards of education. "These local entities, must, however, fulfill the educational interests of the state by meeting certain mandates."New Haven v. State Board of Education, supra, 228 Conn. 704. Thus, "a town board of education is an agency of the state in charge of education in the town; to that end it is granted broad powers by the legislature; and it is beyond control by the town or any of its officers in the exercise of those powers or in the incurring of expense, to be paid by the town, necessitated thereby except as limitations are found in statutory provisions".Board of Education of Stamford v. Board of Finance,127 Conn. 345, 349 (1940).
At the same time it must be recognized that "local boards of education are also agents of the municipality that they serve".Cheshire v. McKenney, supra, 182 Conn. 258. They "act on behalf of the municipality . . . in their function of maintaining control over the public schools within the municipality's limits". Id. And, it is not only a state statute which defines the powers of the local boards of education but also local charter provisions, as long as those provisions are "not inconsistent with or inimical to the efficient and proper CT Page 11113 operation of the educational system otherwise entrusted by state law to the local boards". Local Number 1186 AFSCME v. Board ofEducation, 182 Conn. 93, 101 (1980). See also Board of Educationv. Ellington, 151 Conn. 1, 6-7 (1965); Cahill v. Board ofEducation, 187 Conn. 94, 101 (1982).
From this very brief review of the dual nature of local boards of education, it can be seen that the Supreme Court was not putting too fine a point on it when it described the financial relationship between local boards of education and municipal governments as "complex". New Haven v. State Board ofEducation, supra, 228 Conn. 705-06. Nor is it surprising that there has been "a long line of cases which deal with some aspect of the continuing problem of the respective powers of a board of education vis-a-vis the municipal board of finance". WaterburyTeachers Association v. Furlong, 162 Conn. 390, 393 (1972). This case would seem to be the most recent in that "long line" and one which raises, perhaps most starkly, the conflict between the power of the town (and, indeed, of its residents and taxpayers) and the prerogatives of the board as a state agency operating to control the schools in that town.
Almost 60 years ago, in an attempt to define this "complex" relationship, the Supreme Court laid down what has been referred to since as the "controlling law"[9]:
 Where a town board of education includes in the estimates it submits to a board of finance expenditures for a purpose which is not within statutory provisions imposing a duty upon it nor within one which vests it with a discretion to be independently exercised, the board of finance may, if in its judgment, considering not only the educational purpose to be served but also the financial condition of the town, it finds that the expenditure is not justified, decline to recommend an appropriation for it; where, however, the estimate is for an expenditure for a purpose which the statutes make it the duty of the board of education to effectuate or they vest in the board of education a discretion to be independently exercised as to the carrying out of some purpose, the town board of finance has not the power to refuse to include any appropriation for it in the budget it submits and can reduce the estimate submitted by the board of education only when that estimate exceeds the amount reasonably necessary for the CT Page 11114 accomplishment of the purpose, taking into consideration along with the educational needs of the town its financial condition and the other expenditures it must make. The board of finance in such a case must exercise its sound judgment in determining whether or to what extent the estimates of the board of education are larger than the sums reasonably necessary and if it properly exercises its discretion and the budget is approved by the town the board of education has no power to exceed the appropriations made.
Board of Education of Stamford v. Board of Finance, supra,127 Conn. 350-51.
That this is still the controlling rule of law is demonstrated by the reliance of the Court on this same formulation in its two most recent decisions in this field. SeeNew Haven v. State Board of Education, supra, 228 Conn. 706-07;Board of Education v. New Haven, supra, 237 Conn. 28-29. It sets up a political and legal balancing process through which the legitimate interests of both the board and the town can be accommodated. In the Stamford case the court went so far as to require the board of education to itemize its budget requests "so as to indicate whether a proposed expenditure falls within one class or the other; and the action of the board of finance, before any reduction could be made, would necessarily involve a separate consideration of the items". Board of Education ofStamford v. Board of Finance, supra, 127 Conn. 352.
This balancing process has been recognized in the Naugatuck charter. Section 12 requires the board of education to present to the board of finance itemized estimates of expenditures for the ensuing fiscal year, to be included in the overall town budget. Thereafter, the process described above goes forward, i.e., publication of a summary of the budget, a public hearing and adoption of the budget by the board of finance and the board of mayor and burgesses. The amendment of the charter in 1996, however, added a dramatically different element to this process. It grants to the electors of the town a veto power over the budget adopted by way of the legal and political balancing required by the test set forth for the first time in the Stamford
case. The question thereby presented is whether such a power to vote down the board of education budget, alone, without consideration of the relationship of the proposed expenditures and the statutory and constitutional mandate of the board of CT Page 11115 education is or can be authorized by any of the town's Home Rule powers.
As pointed out early in this memorandum, Connecticut's Home Rule Act demonstrates a legislative determination that "issues of local concern are most logically answered locally, pursuant to a home rule charter, exclusive of the provisions of the General Statutes". Caulfield v. Noble, supra, 178 Conn. 86. Indeed, there is a constitutional provision guaranteeing home rule. Article 10th, 1. Even the Caulfield case, however, recognized that this right to legislate locally applied only to "purely local affairs" and not to "those things of general concern to the people of the state". Id., 87 (Emphasis added.). Furthermore, § 7-188, C.G.S., specifically prohibits charter amendments that are "inconsistent with the constitution or general statutes."
This distinction between local and statewide concerns has been given explicit recognition in the education area. "It is an established principle that local charter powers must yield to the superior power of the state when the two enter a field of statewide concern." Wallingford v. Board of Education,152 Conn. 568, 574 (1965). The question presented in the Wallingford case was whether the power of the board of education to employ personnel in the schools was improperly invaded by a requirement that the board observe the civil service requirements of the charter in the employment of those personnel. The court concluded in the negative because "the ability to perform the statutory duties imposed on the board are (sic) not destroyed or interfered with in any unreasonable way" by this requirement. Id., 574.
In Waterbury Teachers Association v. Furlong, supra,162 Conn. 400, the Court held that "a municipal legislative or finance body may not impede implementation of the statutory obligation of the board of education to `maintain . . . good public elementary and secondary schools' as required by General Statutes § 10-220 by refusing to appropriate or approve an appropriation for a minimum level of compensation for teachers necessary to attract and retain a reasonable number of qualified professional personnel". In Furlong, the court upheld the action of the mayor and the board of finance in refusing to supply the funds necessary to pay teachers in the local schools only because there was no claim, and the Court did not find, that the labor contract in question and the salary increases provided in it were necessary to enable the board of education to perform its statutory duties under § 10-220. CT Page 11116
The residents and taxpayers of Naugatuck, through their local budgetary authorities, clearly possess the power to "manage, regulate and control the finances" of their town. § 7-194, C.G.S. The question is whether the particular method embodied in the amended charter provision, whereby the electors may veto the board's budget, alone, is "inconsistent with or inimical to the efficient and proper operation of the educational system otherwise entrusted by state law to the local" board of education. Cheshire v. McKenney, supra, 182 Conn. 259. This court concludes that it is.
By its very terms the referendum provision added in 1996 permits the voters to negate the balancing process set up by a long line of Supreme Court decisions in order to give effect to the respective powers of local boards of education and local financing authorities. Without regard for whether the expenditures included in the board's budget are for purposes which the state statutes make it the duty of the board to effectuate; e.g., providing pupil transportation, § 10-220(a), and special education, § 10-76d; meeting the minimum expenditure requirement of § 10-262; or whether they are for purposes within the board's discretion under state statutes, the voters may simply reject the board's budget, a power which their board of finance lacks. Such a blanket veto power frustrates not only § 10-220 of the General Statutes but the entire statutory scheme for providing for an adequate public education for elementary and secondary school children, as required by the constitution.
This case is most like a case from a field other than education, Shelton v. Commissioner, 193 Conn. 506 (1984). There the city of Shelton brought three separate actions seeking to prevent the defendant, the Connecticut Resources Recovery Authority ("CRRA"), from implementing its plan to operate a regional landfill in Shelton. One of those actions relied on local zoning regulations which operated to exclude facilities such as the CRRA had found necessary and which the state Department of Environmental Protection had found environmentally acceptable. The Court found that the statutes enacted to govern solid waste in the state "evidence a legislative intent to commit the difficult regional problems of solid waste disposal to regional and statewide solution." Id., 518. Further, it held that "local zoning regulations . . . frustrate the explicit purposes of the state statutes and are therefore preempted." Id. The court CT Page 11117 explicitly rejected the argument that the home rule provision of the constitution precluded the state legislature from addressing problems of statewide concern. Id., 521.
In words particularly apt for this case the court noted that "[t]he regional and statewide solution of these (solid waste disposal) problems involves a delicate political balance among the competing interests of numerous individual communities. The resolution of such conflicts is appropriately confided to the General Assembly, where the whole population of the state is represented." Id., 523. The same type of "delicate political balance" is involved here, albeit a balance between the powers of the state and the powers of local government in the field of education. By constitution and by statute these are matters of statewide concern not just of concern to the taxpayers and residents of Naugatuck. As the Court held in the Wallingford
case, "local charter powers must yield to the superior power of the state when the two enter a field of statewide concern."152 Conn. at 574. And, such a provision must yield in the field of education when "[t]he ability to perform the statutory duties imposed on the board (of education) are . . . destroyed or interfered with in any unreasonable way." Id.[10]
For the reasons cited above, the court finds that the charter provision at issue here does so destroy and interfere with the ability of the board to perform its statutory duties. Therefore, it conflicts with § 10-220 and other "general laws" furthering the statewide interest in education and is invalid.
 4. The Membership Amendment
Prior to and since the amendment of 1996, the board of education consists of nine members. The change effected by the amendment was that the person elected to be mayor of the town is also elected by the voters as one of the nine members of the board.[11] The parties agree that the effect of the amendment has been to reduce the number of persons elected solely to the board from nine to eight. Where they differ is in the status of the mayor. The board contends that the mayor is, by virtue of his election as mayor, an "ex officio" member of the board, and that nowhere in the statutes is there authorization for the mayor to serve in that capacity. The town claims that the mayor is one of the elected members of the board, by virtue of his election as mayor. Therefore, the town argues, the charter amendment does not violate § 9-206a, C.G.S., which requires that all members of CT Page 11118 the board be elected.[12]
On May 5, 1997 elections to the board took place, and, pursuant to the charter provision, only two of the three open seats on the board were placed on the ballot.[13] Two incumbent members were elected, and the voters elected Timothy Barth mayor as well as a member of the board of education. The effect was that a previously elected member of the board, whose term expired in May 1997, was replaced by the mayor.
 It is settled law that as a creation of the state, a municipality has no inherent powers of its own. . . A municipality has only those powers that have been expressly granted to it by the state or that are necessary for it to discharge its duties and to carry out its objects and purposes. . . In determining whether the municipality had the authority to adopt [this amendment to section 3.18 of the Naugatuck charter], then "we do not search for a statutory prohibition against such an enactment; rather, we must search for statutory authority for the enactment." Avonside, Inc. v. Zoning and Planning Commission, 153 Conn. 232, 236 . . . (1965).
Buonocore v. Branford, 192 Conn. 399, 401-402 (1984), as cited inNorwich v. Housing Authority, 216 Conn. 112, 123 (1990).[14]
The Supreme Court has recognized in more than one case that "[t]he legislature has been very specific in enumerating those powers it grants to municipalities" through Title 7 of the General Statutes e.g. Buonocore v. Branford, supra, 403. And, the Court has held that, "[a]n enumeration of powers in a statute is uniformly held to forbid the things not enumerated". (Citations omitted; internal quotation marks omitted.) State ex rel Barnardv. Ambrogio, 162 Conn. 491, 498 (1972). Applying this rule, the Court has found invalid an ordinance creating a Commission On Equal Opportunities in the town of New Haven, New HavenCommission v. Yale University, supra, and has struck down a provision of the Branford town charter which prohibited state employees from holding elective office in the town. Buonocore v.Branford, supra.
At the same time, the court has made it very clear that the Home Rule Act is entitled to an "expansive" interpretation.Norwich v. Housing Authority, supra, 216 Conn. 118 (1990). CT Page 11119 (". . . [I]f ever a statutory plan cried out for an expansive construction favoring local municipal authority over its own affairs, it is the Home Rule Act.") Further, the Court has applied this approach to the very statute at issue in this case; viz., 7-193(b).[15] Applying this "expansive construction" in the Norwich case, the Court held that the city had the power to abolish the housing authorities of the town and city of Norwich and to transfer their assets and liabilities to a new "Norwich Housing Authority". Similarly, in Dumais v. Underwood,47 Conn. App. 783, 793 (1998), the Appellate Court held that "the manner in which members are appointed to a charter revision commission is a matter of local concern governed by the town's charter, unless specifically prohibited by the constitution or General Statutes".
Giving § 7-193(b) the "expansive construction" required by the Supreme Court, this court concludes that its terms are clearly broad enough to permit the action authorized by the charter amendment. What the charter amendment does is to "alter the method of election" to the board of education, by providing that the person elected as mayor is also elected as a member of the board. The mayor does not serve on the board "ex officio". He is elected to the board at the same time that he is elected mayor. As the town argues, the electors of the town are enabled by the charter amendment to consider the respective candidates' positions on educational matters, as well as other town concerns, in making their choice at the general election. In that way the mandate of § 9-206a, C.G.S., that members of the board be elected, is satisfied.
Since the board in issue here, however, is the board of education, that is not the end of the matter. The analysis of the interplay between local charter provisions and state statutes concerning education which was relevant in discussing the budget amendment is equally relevant here. Unlike the veto power given the town's electors by the budget provision, however, the election of the mayor as one of nine members of the board of education does not "destroy or interfere . . . in any unreasonable way" with the board's ability to perform its statutory duties. See Wallingford v. Board of Education, supra,152 Conn. 574. Nor is it "inconsistent with or inimical to the efficient and proper operation of the educational system otherwise entrusted by state law to the local [board]". LocalNumber 1186, AFSCME v. Board of Education, supra, 182 Conn. 101; nor does it "impermissibly impinge upon the function of the local CT Page 11120 board of education in fulfilling its statutory duty respecting education". Cheshire v. McKenney, supra, 182 Conn. 260-61. Whatever formulation one uses of the appropriate test for evaluating the interplay between local charter provisions and the board's statewide responsibilities, simply allowing the electors to vote for an individual both as mayor and as a member of the board of education does not impact negatively upon the statewide concern for education.
This is still not the end of the matter, however. Citing a line of cases having to do with the holding of governmental offices which are incompatible the board argues that membership on the board of education and service as mayor presents a conflict of interest for the individual serving in both of those capacities and is, for that reason, invalid.
On its face, this argument has considerable conceptual force. As mayor, the individual elected answers only to the residents and taxpayers of Naugatuck. As a member of the board of education, however, the mayor has another master; viz., the state, through the educational mandates which the board must fulfill; e.g., the provision of adequate and reasonable pupil transportation, special education services and funding the schools not only to the "minimum expenditure requirement" established by § 10-262j, C.G.S., but sufficiently to meet its other educational requirements. New Haven v. State Board ofEducation, supra, 728 Conn. 704-05, 719-20. In a controversy over whether those state mandates have been fulfilled, particularly those having to do with finances, the board, of which the mayor is a member under this charter provision, and the mayor in his capacity as mayor may well find themselves on opposite sides of the same litigation, as was the case in the two New Haven cases cited frequently in this memorandum. Indeed, in this litigation the board (now including the mayor) and the mayor are on opposite sides of the litigation. Does this demonstrate that the charter sets up an unresolvable tension between the mayor's duties as mayor and the mayor's duties as a member of the board?
"It has long been firmly settled at common law" that a person may not hold two public offices that are incompatible. State exrel. Butera v. Lombardi, 146 Conn. 299, 302 (1959). Accord:Stolberg v. Caldwell, 175 Conn. 586, 605 (1975). "The common-law doctrine developed to preclude one person from holding two public offices the duties of which could give rise to possible conflicts of governmental, as distinguished from personal or private, CT Page 11121 interests. The doctrine arises out of the public policy that an officeholder's public performance not be influenced by divided loyalties." 63C Am.Jur.2d, Public Officers and Employees, p. 505 (1997).
The test established in this state is the standard one found in decisions of other states when the subject of incompatible offices has arisen:
 Incompatibility which at common law operates to vacate one office by reason of incumbency of another exists when the character and nature of the offices or their relationship to each other are such that they ought not to be held by the same person because of the "contrariety and antagonism which would result in the attempt by one person to faithfully and impartially discharge the duties of one, toward the incumbent of the other". (Citations omitted)
State ex rel. Schenck v. Barrett, 121 Conn. 237, 242 (1936). To this test must be added "considerations of public policy rendering it improper for one incumbent to occupy both offices".Id., 243. "If the duties of the two offices are such that when placed in one person they might disserve the public interests, or if the respective offices might or will conflict, even on rare occasions, it is sufficient to declare them legally incompatible." 63C Am.Jur.2d, p. 502.
With these principles in mind, to paraphrase the Court's opinion in the Schenck case, this court's "present inquiry is whether or not the nature and duties of the office of member of the [board of education] and [mayor] . . . (are) such that contrariety and antagonism would result in the attempt by one person to faithfully and impartially discharge the duties of both". (Internal quotation marks omitted; citations omitted.)Id., 243.
Not only is the mayor of Naugatuck, the "chief executive magistrate thereof", according to the town charter, he is obviously a member of the Board of Mayor and Burgesses, which, itself, has plenary authority "to make, alter and repeal such orders, rules, regulations and bylaws as they shall see fit in relation to" a long list of subject matters concerning the affairs of the borough.[16] Besides being a member of that board, the mayor is entitled to "veto any matter approved by a CT Page 11122 vote of the board", which veto can only be overridden by a vote of two-thirds of the burgesses. Finally, the mayor is a member of the town board of finance, which, along with the board of mayor and burgesses, is the budget-making authority for the town.
A few examples will suffice to indicate the inherent incompatibility of these offices with the mayor's service on the board of education. As pointed out in the earlier discussion of the budget amendment, the board of education must submit its proposed budget for any given year to the board of finance so that the latter board may consider whether or not to approve the board's request and include it in the overall budget. See p. 13, supra. Moreover, should the board's appropriation for any fiscal year prove inadequate for its needs, it must submit a request for additional funds to the board of finance for its approval and may not expend any additional funds unless that approval is forthcoming. § 10-222, C.G.S. The function of a board of finance is "to eliminate wasteful or extravagant expenditures by considering the financial aspects of the municipal government as a whole rather than from the limited viewpoint of any particular department, whether it is the department in charge of education or of fire prevention or of police protection. . . ." Risi v.Norwalk, 144 Conn. 525, 528 (1957). See Fowler v. Enfield, supra
(Board of finance denies funds needed to pay teacher salary raises agreed to by board of education.
How can the mayor "faithfully and impartially" discharge his duties to the citizens of Naugatuck as a member of the board of finance in reviewing a request for funds from the board of education, of which he is also a member? "It has been stated that the common-law doctrine [of incompatibility] bars an individual from holding two offices when one office is subordinate to the other, as the governmental checks and balances are eliminated because an individual is reviewing his or her own work". 63C Am.Jur.2d, supra, p. 506.
Pursuant to § 7-474, C.G.S., the mayor represents a municipal employer in collective bargaining with any employee organizations, except that a school board shall represent the municipal employer in collective bargaining with school employees and "shall have the authority to enter into collective bargaining agreements" with any employee organizations. See Local 1186,AFSCME v. Board of Education, supra, 182 Conn. 106-111. The mayor as a member of the board of education could easily find himself bargaining for terms and conditions of employment for school CT Page 11123 employees which are necessary, for example, to attract and retain qualified teachers, which may be at variance with the terms and conditions of employment which he wishes to bargain for with other town employees. It seems unlikely that his ability to "faithfully and impartially" discharge the duties of both offices would be unaffected by such conflicting interests.
That these are not academic concerns is shown by the facts ofWaterbury Teachers Association v. Furlong, supra, 162 Conn. 390. There, the plaintiff teachers association, after negotiations, entered into a written contract with the board of education, providing for salary increases for teachers in the public school system. Although the city charter empowered the board to employ teachers, it also provided that the board of finance would have final approval over their salaries. The defendants, the boards of aldermen and finance, voted against honoring the contract, and the request by the board of education for funds necessary to implement the contract was vetoed by the mayor, himself. As indicated in the earlier discussion of this case, the court upheld the actions of town officials only because there was no claim by the board of education that the contract in question was necessary to enable the board of education to perform its duties under § 10-220, C.G.S.
Finally, pursuant to § 10-220, C.G.S., the fundamental duty of the board of education is to "implement the educational interests of the state as defined in § 10-4a".[17] Those educational interests are defined in § 10-4a, C.G.S., to include the obligation that each school district "finance at a reasonable level at least equal to the minimum expenditure requirement pursuant to the provisions of § 10-262j an educational program designed to achieve" the end that each child shall have an "equal opportunity to receive a suitable program of educational experiences". That this obligation of the mayor as a member of the board of education may be directly incompatible with his ability to "faithfully and impartially" discharge his duties as mayor and a member of the board of finance, charged with the overall responsibility to "manage, regulate and control the finances" of the town, § 7-194, C.G.S., is demonstrated by that "long line of cases which deal with some aspect of the continuing problem of the respective powers of a board of education vis-a-vis the municipal board of finance"[18], many of which are cited and discussed earlier in this memorandum. Section 10-4b, C.G.S., sets up an elaborate process whereby the state board of education may inquire into the failure or CT Page 11124 inability of a local board of education to implement the educational interests of the state, as required by § 10-220, C.G.S. Remedies available to the state board include the issuance of orders to local governmental bodies or their agents "to take reasonable steps to comply with requirements of § 10-4a" and allow the state board to seek a court order compelling compliance with such an order.
This is exactly the process which resulted in New Haven v.State Board of Education, 228 Conn. 699 (1994), in which the plaintiffs were the city and its board of finance, and the defendant was the local board of education. There, the state board ordered the city to make available additional funds to the board of education, and the Supreme Court upheld those orders, concluding "that the obligation of the town to appropriate sufficient funds to a local board of education to meet the [minimum expenditure requirement] has not been met if the appropriation is sufficient to meet [the minimum expenditure requirement] but insufficient for other educational requirements." Id., 719. This case, too, demonstrates that the concerns about incompatibility between the mayor as board of education member and the mayor as chief executive officer and board of finance member are not theoretical.
"An incompatibility exists whenever the statutory functions and duties of the offices conflict or require the officer to choose one obligation over another. If this is the governmental scheme, incompatibility must be found even though in practice a conflict of duty might never arise." 63C Am.Jur.2d, supra, p. 502. Thus, the point is not that conflicts of duties will always arise but there are "at least strong possibilities of conflicts of financial interests between" the board of education and the town, of which the mayor is the chief executive officer and, through his membership on the board of finance and the board of mayor and burgesses, the budget-making authority as well.[19]State ex rel. Schenck v. Barrett, supra, 121 Conn. 244.
For the foregoing reasons this court finds that the mayor's divided loyalties create "such potential and probable conflicts of interest, affecting the attempt of one person impartially and faithfully to perform the duties of both offices, as to render them incompatible within the rule, especially when, as here, personal interests are transcended by the important public interest of proper administration of municipal finances", id., 245-46, as well as the maintenance of good public schools. CT Page 11125 Therefore, the charter provision placing the mayor on the board of education is found to be invalid.
 Conclusion
The board's motion for summary judgment is granted, and the court declares that the amendments to §§ 3.18 and 14 of the charter were and are invalid.
SHORTALL, J.